**GUTRIDE SAFIER LLP**
ADAM J. GUTRIDE (State Bar No. 181446)
SETH A. SAFIER (State Bar No. 197427)
KRISTEN G. SIMPLICIO (State Bar No. 263291)
100 Pine Street, Suite 1250
San Francisco, California 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

**TYCKO & ZAVAREEI LLP**
HASSAN A. ZAVAREEI (State Bar No. 181547)
JEFFREY D. KALIEL (State Bar No. 238293)
2000 L Street, N.W., Suite 808
Washington, DC 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950

Attorneys for Plaintiff SCOTT KOLLER

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

| | |
|---|---|
| SCOTT KOLLER, an individual, on behalf of himself, the general public and those similarly situated, | CASE NO. 3:14-CV-2400-RS |
| Plaintiff, | PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF |
| v. | |
| MED FOODS, INC., AND DEOLEO USA, INC. | Date: December 3, 2015 |
| | Time: 1:30 p.m. |
| | Ctrm. 3, 17th Floor |
| Defendants. | |
| | Hon. Judge Richard Seeborg |

## **TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION ...................................vi

MEMORANDUM OF POINTS AND AUTHORITIES ...........................................................1

I. INTRODUCTION ...............................................................................................................1

II. STATEMENT OF FACTS .................................................................................................2

   A. Deoleo USA Markets and Sells Bertolli Brand Olive Oil Products. ...................................2

   B. Deoleo Sells Its EVOO Product As "Extra Virgin" Even Though It Does Not Meet The Necessary Chemical and Sensory Standards. ..................................................................2

      1. Extra Virgin Olive Oil Is A Perishable Product That Must Have Specified Characteristics. ..................................................................................................................3

      2. Deoleo's EVOO Product Consistently Fails To Meet Chemical and Sensory Tests. ...................................................................................................................................3

      3. Deoleo Refuses To Take Corrective Action But Instead Continues to Manufacture, Ship, and Handle Its EVOO Product Using The Same Flawed Policies and Procedures. ..............................................................................................4

      4. Deoleo Employed Identical False And Misleading Advertising To Sell Its Products as "Imported from Italy" Throughout the Class Period. ............................7

   C. Consumers Seek Out And Pay Premiums for Real Italian and Extra Virgin Olive Oil. ...............................................................................................................................................9

   D. Deoleo's False Representations Misled Plaintiff And Consumers Like Him. ...................10

III. ARGUMENT ...................................................................................................................11

   A. Legal Standards For Class Certification ............................................................................11

   B. The Classes Satisfy the Requirements of Rule 23(a). .......................................................12

      1. Numerosity And Ascertainability Are Satisfied. ...........................................................12

      2. Common Questions of Fact and Law Apply to Both Classes. ......................................13

      3. The Plaintiff is Typical of Both Classes. .....................................................................15

      4. The Plaintiff Will Adequately Protect the Interests of the Classes. .............................16

   C. The Class Satisfies the Requirements of Rule 23(b)(3). ...................................................17

      1. Common Issues Predominate Over Any Individual Issues that Might Exist. ...............17

      a. Common questions about whether Deoleo's representations were likely to deceive reasonable customers predominate. ...................................................................17

      b. Whether Deoleo's Representations Are Unlawful Predominate For All Imported From Italy Class Members. ........................................................................20

i

c. Common Questions Predominate Across the Extra Virgin Class As To Whether Deoleo's Policies and Procedures Were Adequate To Ensure Consumers Actually Received True "Extra Virgin" Grade Olive Oil.................................................21

d. Common Questions on Restitution and Damages Predominate Over Individual Issues. ................................................................................................22

2. A Class Action Is Superior ..............................................................................24

IV. CONCLUSION.............................................................................................................25

Plaintiff's Motion for Class Certification; Memorandum In Support

### TABLE OF AUTHORITIES

**CASES**

*Allen v. Hyland's Inc.*, 300 F.R.D. 643 (C.D. Cal. 2014)................................................ 13, 18, 19

*Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001) ........................................................ 11

*Astiana v. Kashi Co.*, 291 F.R.D. 493 (2013) ............................................................... 12, 15

*Brockey v. Moore,* 107 Cal.App.4th 86 (2003) ............................................................. 14

*Brown v. Hain Celestial Grp., Inc.,* 2014 WL 6483216 (N.D. Cal. Nov. 18, 2014) ... 19, 21, 22, 24

*Butler v. Sears, Roebuck & Co.*, 727 F.3d 796 (7th Cir. 2013) *cert. denied,* 13-430,
    2014 WL 684064 (U.S. Feb. 24, 2014)................................................................. 25

*Carnegie v. Household Int'l, Inc.*, 376 F.3d 656 (7th Cir. 2004)....................................... 26

*Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013) .................................................... 13

*Cel–Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.,* 20 Cal.4th 163
    (1999) ........................................................................................................... 15, 20

*Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042 (9th Cir. 2000) ..................... 15

*Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365 (N.D. Cal. 2010) .............. 15

*Colgan v. Leatherman Tool Group, Inc.,* 135 Cal.App. 4th 663 (2006)........................ 23

*Comcast v. Behrend*, 133 S. Ct. 1426 (2013)................................................................. 23

*Cortez v. Purolator Air Filtration Products Co.,* 23 Cal. 4th 163 (2000) ...................... 23

*Delarosa v. Boiron, Inc.*, 275 F.R.D. 582 (C.D. Cal. 2011) .......................................... 19

*Forcellati v. Hyland's, Inc.,* 2014 WL 1410264 (C.D. Cal. Apr. 9, 2014) ..................... 13

*General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147 (1982) ...................... 12, 14

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998)............................................. 11

*Hanon v. Dataproducts Corp.,* 976 F.2d 497 (9th Cir. 1992)........................................ 16

*Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909 (9th Cir. 1964) .................. 12

*In re Brazilian Blowout Litig.,* 2011 WL 10962891 (C.D. Cal. Apr. 12, 2011) .............. 20

*In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919 (C.D. Cal. 2015) ................................. 24

*In re High-Tech Employee Antitrust Litig.,* 985 F. Supp. 2d 1167 (N.D. Cal. Oct. 24,
    2013) ........................................................................................................... 25

*In re POM Wonderful LLC Marketing & Sales Practices Litig.*, 2012 WL 4490860
    (C.D. Cal. Sept. 28, 2012)............................................................................. 15

*In re Steroid Hormone Prod. Cases,* 181 Cal. App. 4th 145 (2010), *as modified on denial of reh'g* (Feb. 8, 2010) ................................................................................ 19

*In re Tobacco II Cases* (2009) 46 Cal. 4th 298 ........................................... 14, 18, 19, 20

*In re Toyota Motor Corp.,* 790 F. Supp. 2d 1152 (C.D. Cal. 2011) ............................. 22

*In re Vioxx Class Cases*, 180 Cal. App. 4th 116 (2009) ............................................. 19

*In re Visa Checks/MasterMoney Antitrust Litig.*, 280 F.3d 124 (2d Cir. 2001) ................... 17, 26

*In re Whirlpool Corp. Front-Loading Washer Products Liab. Litig.*, 722 F.3d 838 (6th Cir. 2013) *cert. denied,* 13-431, 2014 WL 684065 (U.S. Feb. 24, 2014) ........................ 25

*Jordan v. County of Los Angeles,* 669 F.2d 1311 (9th Cir. 1982), *vacated on other grounds,* 459 U.S. 810 (1982) ........................................................................... 12, 16

*Kasky v. Nike, Inc.,* 27 Cal. 4th 939 (2002) ........................................................... 14

*Korea Supply Co. v. Lockheed Martin Corp.,* 29 Cal. 4th 1134 (2003) ......................... 23

*Kumar v. Salov N. Am. Corp.*, 2015 WL 457692 (N.D. Cal. Feb. 3, 2015) ..................... 22

*Lam v. Gen. Mills, Inc.*, 859 F. Supp. 2d 1097 (N.D. Cal. 2012) ................................ 18

*Levya v. Medline Industries, Inc.,* 716 F.3d 510 (9th Cir. 2013) ................................ 24

*Lilly v. Jamba Juice Co.,* 2014 WL 4652283 (N.D. Cal. Sept. 18, 2014) ...................... 13

*Marsu, B.V. v. Walt Disney Co.,* 185 F.3d 932 (9th Cir. 1999) ................................... 25

*Mazza v. Honda American Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012) .................... 14

*McCrary v. Elations Co., LLC,* 2014 WL 1779243 (C.D. Cal. Jan. 13, 2014) .................. 24

*Mullins v. Direct Digital, LLC,* 795 F.3d 654 (7th Cir. July 28, 2015) ........................ 13

*Occidental Land, Inc. v. Superior Court*, 18 Cal. 3d 355 (1976) ............................... 20

*Plascencia v. Lending 1st Mortgage*, 259 F.R.D. 437 (N.D. Cal. 2009) ........................ 15

*Pulaski & Middleman, LLC v. Google, Inc.*, -- F.3d --, 2015 WL 5515617 (9th Cir. Sept. 21, 2015) ................................................................................... 24, 25

*Rahman v. Mott's LLP*, 2014 WL 6815779 (N.D. Cal. Dec. 3, 2014) ........................... 13

*Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523 (N.D.Cal.2012) ................... 12, 13, 15

*Rikos v. Procter & Gamble Co.*, 799 F.3d 497 (6th Cir. Aug. 20, 2015) ...................... 14

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) ............................................... 17

*Stearns v. Ticketmaster Corp.*, 655 F.3d 1013 (9th Cir. 2011) ........................... 17, 19, 20

*Vasquez v. Superior Court,* 4 Cal. 3d 800 (1971) ................................................... 14

iv

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) .................................................. 12, 14, 18

*Williams v. Gerber Products Co.,* 552 F.3d 934 (9th Cir. 2008) ............................................ 14, 18

*Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168 (9th Cir. 2010) .................................. 23

*Wolph v. Acer Am. Corp.*, 2012 WL 993531 (N.D. Cal. Mar. 23, 2012) ...................................... 19

*Wolph v. Acer Am. Corp.*, 272 F.R.D. 477 (N.D. Cal. 2011) .......................................................... 12

*Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087 (9th Cir. 2010) .................................... 24

*Zeisel v. Diamond Foods, Inc.*, 2011 WL 2221113 (N.D. Cal. June 7, 2011) ........................ 20, 24

**STATUTES**

Cal. Bus. & Prof.Code § 17535 ........................................................................................... 23

Cal. Bus. & Prof.Code § 17203 ........................................................................................... 23

Cal. Civ. Code § 1780 ........................................................................................................... 23

Cal. Civ. Code § 3294(a) ....................................................................................................... 23

Cal. Civ. Code § 1761 ........................................................................................................... 23

Cal. Health & Saf. Code § 110100(a) ................................................................................... 21

Cal. Health & Saf. Code § 110380 ....................................................................................... 22

Cal. Health & Saf. Code § 110505 .................................................................................. 15, 22

Cal. Health & Saf. Code § 109875 ....................................................................................... 21

**FEDERAL REGISTER**

19 C.F.R. § 134.46 ............................................................................................................ 8, 21

21 C.F.R. § 101.18 ................................................................................................................ 15

## NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

Please take notice that on December 3, 2015, at 1:30 p.m., or as soon thereafter as this motion may be heard, Plaintiff Scott Koller will, and hereby does, move, pursuant to Rule 23 of the Federal Rules of Civil Procedure, to certify the following classes:

> Imported from Italy Class ("IFI Class"): All purchasers in California of liquid Bertolli Extra Light, Classico, or Extra Virgin olive oil, between May 23, 2010 and May 30, 2014, except for those bearing labels "Organic," "Robusto," "Gentile," or "Fragrante."
>
> Extra Virgin Olive Oil Class ("EVOO Class"): All purchasers in California of bottles of Bertolli Extra Virgin olive oil, between May 23, 2010 and August 15, 2015, except for those bearing labels "Organic," "Robusto," "Gentile," or "Fragrante."[1]

A complete list of the products at issue in this case is provided in Appendix A.

The Classes will pursue claims under the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq. ("UCL"); the California Legal Remedies Act, Cal. Civ. Code §§ 1750 et seq., ("CLRA"); the California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 et seq. ("FAL"); and for common law fraud, deceit and/or misrepresentation.

Plaintiff further requests that the Court appoint (1) Plaintiff Scott Koller as class representative on all claims, and (2) Gutride Safier LLP and Tycko & Zavareei LLP as class counsel. Plaintiff finally requests the Court to order the parties to meet and confer and present this Court, within fifteen (15) days of an order granting class certification, a proposed notice to the certified classes.

This motion follows conferences and communications between counsel and is based upon this Notice of Motion and Motion, Memorandum of Points and Authorities, and the accompanying Declarations in support of Class Certification by the following persons:

Kristen Simplicio;

Rodney Mailer;

---

[1] Both Classes exclude persons whose purchases were for purpose of resale or who returned all their purchases for a refund. The Imported from Italy class includes all UPC codes from 41790001303 to 41790221060, inclusive, except for 41790002706. The Extra Virgin class includes all UPC codes 41790016xx, 41790002xxx (other than 41790002706), and 41790214260. By definition, neither Class includes olive oil sprays. See Appendix A for a complete list.

Colin Weir;

Adam Gutride; and

Hassan Zavareei.

(In the Memorandum of Points and Authorities that follows, those declarations shall be referred to by the last name of the declarant, followed with the abbreviation "Decl." (For example: "Simplicio Decl.") This Motion is also based on the pleadings and papers on file in this action and all matters of which this Court may take notice.

Plaintiff's Motion for Class Certification; Memorandum In Support

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.     INTRODUCTION

Defendant Deoleo USA, Inc. (f/k/a Med Foods, Inc.) imports, distributes, markets, and sells olive oil under the Bertolli brand name throughout the United States. During the class period, it commonly advertised its oil as "Imported from Italy" and much of it as "extra virgin." But Deoleo's olive oil was neither from Italy nor extra virgin.

First, the Bertolli brand oils included in the class are not and never were "Imported from Italy." Instead, the olives are grown, and the oil is pressed, in various countries all over the world, including Tunisia, Turkey, Greece, Spain, Chile, and Australia. Although the oil is *blended* and *bottled* in Italy, state and federal regulations forbid affixing the "Imported from Italy" label to products that are merely blended or packaged in that country. Common sense also dictates that Turkish or Chilean olive oil does not somehow become "from Italy" when shipped to Italy. Yet until after this case was filed, Deoleo systematically used this misrepresentation to dupe consumers into paying a premium for oil falsely labeled as Italian.

Deoleo also markets and sells a line of Bertolli "extra virgin" olive oil, but the oil in those products is not processed and handled in a way that will reasonably assure that, at time of sale, it meets standards for extra virgin oil set by the State of California, the USDA, and the International Olive Council ("IOC"). Myriad tests—initiated by the University of California Davis, ███████ ████████████████████████████████████████████████ ███████████████████████████████████████████████ But although Deoleo has long been aware that its oil is improperly processed, packaged, shipped and handled, it refuses to take corrective action to assure that consumers are receiving extra virgin olive oil at the time of purchase.

Deoleo's false advertising and unfair and unlawful business practices have been highly successful. The exploding popularity of healthy living, Mediterranean diets, and cooking shows featuring Italian celebrity chefs such as Mario Batali and Giada De Laurentiis have led to widespread consumer demand for the flavor and health benefits of Italian, extra virgin olive oil. Relying on Deoleo's uniform, centrally-controlled practice of false and deceptive advertising, consumers in California purchased millions of bottles. One such consumer was Plaintiff Scott

Koller, who purchased and paid a premium for Defendant's olive oil during the class period, believing it to be both "Imported from Italy" and "extra virgin," when it was neither.

This case is well-suited for class certification. Millions of consumers were exposed to identical misrepresentations on Deoleo's labels and purchased the same mislabeled oil, which was processed, packaged, shipped and handled with the same inadequate procedures. They all paid a premium price due to the mislabeling. That price premium can be determined on a class-wide basis using common proof. These consumers' relatively small individual damages make it economically irrational for them to pursue individual suits. Thus, unless a class is certified here, and Deoleo is enjoined from falsely advertising its Bertolli oils, it has an incentive to continue its misleading practices and will continue to defraud consumers out of millions of dollars each year.

## II.    STATEMENT OF FACTS

### A.    Deoleo USA Markets and Sells Bertolli Brand Olive Oil Products.

Defendant Deoleo USA Inc. is a consumer products company based in Houston, Texas. It markets and sells olive oil products under a variety of brand names, including Bertolli. ((Declaration of Kristen Simplicio ("Simplicio Decl"), Ex. 1.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.*, Ex. 2, Jimenez Ot Tr. at 114:13-24; Ex. 3.) Among the products marketed and sold in the United States (hereinafter referred to collectively as the "Products") are Bertolli ® Extra Virgin Olive Oil ("EVOO Products"), Bertolli ® Classico Olive Oil, and Bertolli ® Extra Light Tasting Olive Oil.

### B.    Deoleo Sells Its EVOO Products As "Extra Virgin" Despite Repeatedly Failing To Meet Chemical and Sensory Standards And Without Taking Proper Precautions To Ensure That the Standards Are Satisfied.

Throughout the class period, Deoleo has uniformly marketed its EVOO Products with "Extra Virgin" displayed prominently on the front panels of every bottle, even though Deoleo failed to take adequate steps to ensure that the oil will be extra virgin when purchased. Deoleo compounded its deception by identically including on the back of all its EVOO Products a "best by date" that falsely leads consumers to believe that the oil will maintain its extra virginity through the date on the bottle.

### 1. Extra Virgin Olive Oil Is A Perishable Product That Must Have Specified Characteristics.

The term "extra virgin" means that the oil has certain defined characteristics established by the IOC, the USDA, and the State of California. (Simplicio Decl., Ex. 4-6.) Among other things, these standards help to ensure that the phenolic compounds, which are responsible for the health benefits of extra virgin olive oil, as well as for maintaining its shelf life, are at sufficient levels. (Declaration of Rodney Mailer ("Mailer Decl.") at ¶ 37.)

Extra virgin olive oil is the highest category of "virgin" oil, meaning oil obtained solely by mechanical extraction from olives, without any heating, bleaching or refining. (*Id.,* ¶¶ 31, 34.) Like any other fresh fruit juice, virgin olive oil is perishable; thus, "extra virgin" oil degrades over time to the lesser category "ordinary virgin" and finally to "lampante," which is not fit for human consumption and must be refined to be edible. (*Id.,* ¶¶ 34, 57.) Exposure to oxygen, light, and/or heat, even for a short period of time, will dramatically exacerbate the degradation process. (*Id.,* ¶ 57.) Even under optimal conditions, where the oil is stored below 59°F in the dark, it will typically qualify as "extra virgin" for only around 36 months; if the olive oil is stored at high temperatures and/or exposed to light, it becomes rancid in a matter of months. (*Id.,* ¶¶ 59-72.)

### 2. Deoleo's EVOO Products Consistently Fail To Meet Chemical and Sensory Standards.

Early in the proposed class period, in June 2010, the Olive Oil Center at the University of California at Davis ("UC Davis") released a report entitled "Tests indicate that imported 'extra virgin' olive oil often fails international and USDA standards." (Simplicio Decl., Ex. 7.) The UC Davis Report evaluated various brands of olive oil, including 18 samples of Bertolli EVOO that its authors purchased at retail. (*Id.*) The Report concluded that 13 of the 18 Bertolli samples, or 72%, failed the "extra virgin" requirements set by the IOC and State of California. (*Id.*) A follow-up report in 2011 again found that the EVOO Products were still not extra virgin, suggesting that Deoleo had done nothing in the intervening year to change its practices. (*Id.*, Ex. 8.)

Numerous subsequent tests conducted on bottles throughout the class period show that those results were not only an aberration, but that Deoleo was continuing to utilize the same failed policies that had resulted in the degradation in 2010. Most recently, in August 2015, Plaintiff's expert tested four bottles of the EVOO Product, and all of them failed. (Mailer Decl., ¶¶ 100-103,

3

Ex. 3f.) A January 2015 test commissioned by National Consumers League of an EVOO Product determined that it too was not extra virgin. (*Id.,* ¶99, Ex. 3d.)[2] Taken together, the 2015 tests show that two of the five bottles were "virgin" oil and the remaining three fared even worse, registering as just "ordinary" on the testing scale. (*Id.,* Ex. 3E, 3F.) Other tests performed by an independent laboratory in 2012 and 2014 arrived at similar conclusions. (*Id.,* ¶¶ 87-92, 97-98, Ex. 3a, 3b.) Chemical tests routinely showed that the oil in the bottles had degraded, so that even where the oil met minimum standards, it was often by very small margins, suggesting the oil may not have continued to be "extra virgin" for much longer, and certainly would not have been likely to do so through the "best by" date on the bottles. (*Id.,* ¶¶ 97-103.) Sensory tests results were even worse; the oil regularly was found to be lacking in the fruitiness necessary for extra virgin oil and had defective flavors such as mustiness or rancidity. (*Id.*)

Deoleo also ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Deoleo then abruptly suspended the testing program.

> **3. Deoleo Refuses To Take Corrective Action But Instead Continues to Manufacture, Ship, and Handle Its EVOO Product Using The Same Flawed Policies and Procedures.**

Deoleo has a uniform response to all the testing data. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. (*Id.,* Ex. 16.) The problem with Deoleo's argument is that it is not enough for a perishable product like olive oil to meet minimum quality standards at the time it goes in the bottle (or if kept in optimum

---

[2] During the class period, other third parties published similar stories. For example, in July 2012, Consumer Reports magazine conducted a study on extra virgin olive oil, and found that Bertolli performed poorly. (Simplicio Decl., Ex. 15.)

1   conditions); rather, Deoleo must take reasonable steps to ensure the oil will continue to meet

2   minimum quality standards at time of sale and through the "best by" date stated on the bottle,

3   taking into account expected conditions of distribution. Yet Deoleo has not taken these steps, but

4   instead continues to utilize the same failed policies and practices for processing, packaging,

5   shipping, and handling throughout the class period that will necessarily cause the oil to degrade,

6   so customers have no reasonable assurance that they are actually receiving extra virgin oil.

7           First, Deoleo has failed to implement proper controls on the oil before it is bottled. ▮▮▮

8   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Although Deoleo

11   requires certification that the oil was extracted without heating, it does not ensure that the

12   suppliers protected the oil from degradation either before or after extraction, such as by

13   specifying how the oil is to be stored or the types of containers in which it should be shipped to

14   Deoleo's processing facilities. (Mailer Decl., ¶ 108.) Nor does Deoleo ensure that it is receiving

15   only fresh, recently harvested oil; to the contrary, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [3] (*Id.*)

17           Second, after blending and bottling the already degraded oil, Deoleo packs it in bottles

18   that accelerate further degradation. Throughout the class period, Deoleo has used clear glass or

19   clear plastic containers for all the EVOO Products, even though it has long acknowledged that the

20   oil degrades when exposed to light, and even though most supermarkets use fluorescent lighting

21   that is particularly dangerous to virgin olive oil. (*Id.*, Ex. 3, p. 16; Ex. 17.) ▮▮▮▮▮▮▮▮

22   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23   ▮▮▮▮▮▮▮▮▮ (*Id.,* Ex. 19.) Though Deoleo did use green glass on some of its more

24   premium brands, such as its organic line of oil and its "Carapelli" brand, it has never done so with

25   the EVOO Products. After the class period, it started selling some of the EVOO Products in green

26

27   [3] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28   (Simplicio Decl., Ex. 18; Mailer Decl., ¶ 109.)

1  plastic bottles, but others are still sold in clear plastic or clear glass.[4] (*Id.,* Ex. 22 (Answer to

2  Interrogatory No. 10).)

3        Third, Deoleo does not take the appropriate steps to protect the oil from high temperatures

4  during shipping, handling, and distribution after bottling. Deoleo's 30(b)(6) witness admitted that

5

6

7  (*Id.*, Ex., 2, Jimenez Ot Tr. at 90:9-91:1; Mailer Decl. ¶

8  112.) Deoleo's witness also admitted that

9

10        and Plaintiff's expert has opined that these temperatures will severely degrade the oil

11  before sale. (Simplicio Decl., Ex., 2, Jimenez Ot Tr. at at 160:13-161:1; Mailer Decl. ¶ 113.)

12        Fourth, Deoleo does not take steps to ensure that oil is sold and consumed quickly, before

13  it degrades to an unacceptable level. Instead, it prints on all its EVOO Products a "Best if Used

14  By" date that is

15            (*Id.*, Ex. 20, Ex. 2, Jimenez Ot. Tr. at 154:14-19.) This period is far longer than its

16  olive oil could reasonably be expected to remain extra virgin,

17

18

19  (*Id.*, Ex. 2, Ot. Tr. at 155:5-11; Mailer Decl., ¶¶ 109, 114.)

20        Despite employing so many practices that accelerate the rate at which the olive oil will

21  perish,

22  (Simplicio Decl., Ex. 2; Jimenez Ot Tr 67:14-68:2; Ex. 21, Roy Tr. at 205:17-206:3.) Deoleo's

23  Vice President agreed that

_____

24  [4]

25                                    (*Id.,* Ex. 22 (Answer to Interrogatory No. 10),

26  Ex. 24.) On July 7, 2015, Deoleo started selling four of its more popular SKU
                                              y No. 10).)

27                                              (*Id.*, Ex. 25 (Deposition of
    Gene Russell ("Russell Tr.") at 235:5-18.) Thus it is unlikely any bottles in dark green plastic

28  were sold before the class cut off date of August 15, 2015.

1

2

3

4

5

6

7

8

9 Despite

10 consistently failing point of sale tests since 2010,

11 (*Id.*, Ex. 21; Roy Tr. at 91:23-92:12,

12 146:24-147:4, 204:25-205:13; Ex. 25, Russell Tr. At 217:19-25.)[5]

### 4. Deoleo Employed Identical False And Misleading Advertising To Sell Its Products as "Imported from Italy" Throughout the Class Period.

In addition to deceiving customers about the "Extra Virgin" status of its olive oils, Deoleo has deceptively advertised all the Products as "Imported from Italy" to deceive customers into believing that the oil is authentic Italian olive oil. For all the Products—not only the "extra virgin" but also the "extra light" and "classico" products, at all times during the class period, the words "Imported from Italy" appeared on the front of the package. (Appendix B; Simplicio Decl., Ex. 23, Interrogatory No. 9.)[6]

_____

[5]

[6] Deoleo also emphasized its Italian origin by including the phrase "Dal 1865," Italian for "Since 1865," and by employing

(*Id.*, Ex od

(*Id.*, Ex. 25 (Deposition of Gene Russell ("Russell Tr.") at 235:5-18.)

7

Contrary to Deoleo's representations, the olive oil inside the bottles is not "from Italy." Rather, Deoleo sources oils from countries on five continents: Europe (Spain, Greece, Italy, Portugal), Africa (Tunisia), South America (Chile), Asia (Turkey), and Australia.[7] (*Id.*, Ex. 29; Appendix B.) Although some bottles may have contained small amounts of oil from olives grown and pressed in Italy, Deoleo has provided no evidence to suggest that any bottle of the Products contained exclusively, or even a majority, of olive oil that was grown and pressed in Italy.

Deoleo's intentional attempt to hide the truth is not only misleading to consumers, but violates state and federal regulations, which require companies to use the product's true "country of origin" in connection with any claims relating to geographic origin. For example, title 19, section 134.46 of the Code of Federal Regulations requires that:

> In any case in which…the name of any foreign country or locality other than the country or locality in which the article was manufactured or produced appear on an imported article or its container, and those words, letters or names may mislead or deceive the ultimate purchaser as to the actual country of origin of the article, there shall appear legibly and permanently ***in close proximity*** to such words, letters or name, and in at least a comparable size, the name of the country of origin preceded by "Made in," "Product of," or other words of similar meaning.

19 C.F.R. § 134.46 (emphasis added). The only exception is for products that are "substantially transformed" from raw materials to finished goods in a particular country; there the country of "substantial transformation" can be used as the country of origin. 19 C.F.R. 134.1(b). In interpreting these regulations in the context of olive oil, the United States Customs and Border Protection[8] ("CBP") held that it was illegal to represent the oil as "Imported from Italy" when it was composed of olives grown and pressed elsewhere. In one example, the manufacturer disclosed the source of the olives in small print towards the bottom of the side panel, the CBP found the disclaimer was not "in close proximity to" the "Imported from Italy" representation and held the practice violated Section 134. (Simplicio Decl., Ex. 30 (Letter N130295, dated November 24, 2010).) The CPB has also held that blending and bottling of oils in Italy does not amount to "substantial transformation." (*Id.*) Deoleo knows this: ████████████████████

---

[7] The precise list of countries varied throughout the class period.

[8] The CBP was formerly known as the U.S. Customs Service under the Treasury Department. It is now under the Department of Homeland Security.



(Simplicio Decl., Ex. 31, Rogers Tr. at 17:10-13, 32:7-17.) Internal documents further establish that ████████████████████ (*Id.*, Ex. 32 (733-35).)

(*Id.*, Ex. 33, p. 2.) Yet instead of adequately disclosing the true geographic origins of the product on the front of the package in proximity to the "Imported from Italy" representation, Deoleo hid the truth in a small, cryptic disclaimer on the back of the package. (Appendix B; Simplicio Decl., Ex. 23, Interrogatory No. 9, Ex. 34.) This disclaimer was standard on all bottles of Defendant's olive oil sold in the United States during the class period. (Appendix B.)

**C.    Consumers Seek Out And Pay Premiums for Real Italian and Extra Virgin Olive Oil**

Deoleo falsely markets the products as extra virgin and "from Italy" because those misrepresentations inflate the price and drive sales.  Over the past twenty years, extra virgin olive oil has become increasingly popular. The media has reported extensively on the health benefits of extra virgin olive oil, with numerous studies suggesting that it can lower cholesterol and risks of cancer. (*Id.*, Ex. 39; Mailer Decl.¶ 37.) Chefs and food writers often recommend extra virgin oil over other types of olive oil. For example, Rachel Ray, a well-known celebrity chef famous for easy to prepare meals, uses extra virgin olive oil so often in her television programs that she was credited with coining the "EVOO" acronym. (Simplicio Decl., Ex. 40.) Deoleo's documents show that "extra virgin" is big drivers for consumers. ████████████████████

Deoleo also knew that consumers prefer Italian oil and that consumers think "Imported from Italy" means 100% Italian oil. For example, in 2010, ████████████████████

9

Plaintiff's economics expert, Colin Weir, has run a preliminary regression analysis of prices of olive oils sold in California since 2010. The data shows that holding other factors constant, oils labeled "Imported from Italy" command between a ███████ premium over oils not making such a claim (depending on the grade of the oil), and oils labeled "extra virgin" command at least an ██████ premium over regular olive oil. (Weir Decl. ¶ 71.) These findings are consistent with several published studies showing that these claims command a market price premium.  (Weir Decl. ¶¶ 8-10, 12.)

**D.      Deoleo's False Representations Misled Plaintiff.**

Plaintiff has purchased numerous bottles of Deoleo's extra virgin olive oil over the years. Most recently, in October 2013, Plaintiff purchased a 750 ml bottle of Bertolli extra virgin olive oil from Safeway for approximately $12.00. (*Id.*, Ex. 41, Deposition of Scott Koller ("Koller Tr.") at 65:17-20, 69:5-10.) Prior to purchasing the Product, he reviewed the packaging and saw the phrases "Imported from Italy" and "Extra Virgin," which led him to conclude that the bottle contained extra virgin olive oil from Italy. (*Id.* at 41:23-42:2, 70:15-21, 86:17-87:15, 124:7-12.)

---

[10] ████████████████████████████████████ (*Id.,* Ex. 42.)

Had Deoleo accurately represented the true nature of the olive oil, Plaintiff would not have purchased it. (*Id.* at 69:2-4.)

On May 23, 2014, Plaintiff filed suit to stop Deoleo's deceptive practices. He pled four causes of action, all under California law: for violations of the Consumer Legal Remedies Act ("CLRA"), False Advertising Law ("FAL"), Unfair Competition Law ("UCL") and fraud, deceit and/or misrepresentation. Plaintiff understands his responsibilities as named plaintiff and class representative and has no conflicts that would prevent him from performing them.

## III.     ARGUMENT

### A.     Legal Standards For Class Certification

Rule 23 provides district courts with broad discretion to determine whether a class should be certified. *See Armstrong v. Davis*, 275 F.3d 849, 872, n.28 (9th Cir. 2001). Class actions are favored where, like here, there is alleged wrongdoing against a large number of persons, each of whom has suffered only a small amount of damages. *See, e.g., Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1023 (9th Cir. 1998) (class certification appropriate because litigation costs would dwarf potential recovery by class members if forced to pursue actions individually).

A class action must satisfy all four requirements in Fed. R. Civ. P. 23(a): "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." In some cases, "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," and certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 1551 (2011) (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160-61 (1982)).

In addition, the class must also satisfy at least one subdivision of Fed. R. Civ. P. 23(b). Here, the Class satisfies Rule 23(b)(3) because "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

**B.      The Classes Satisfy the Requirements of Rule 23(a).**

**1.   Numerosity And Ascertainability Are Satisfied.**

Rule 23(a)(1) requires that the class be so numerous that joinder of all class members is "impracticable." Fed. R. Civ. P. 23(a)(1). "Impracticable" does not mean impossible, only that it would be difficult or inconvenient to join all members of the class. *See Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964). "Where a class is large in numbers, joinder will usually be impracticable." *Jordan v. County of Los Angeles*, 669 F.2d 1311, 1319 (9th Cir. 1982), *vacated on other grounds*, 459 U.S. 810 (1982). The exact size of the class need not be known, as long as general knowledge and common sense indicate that the class is sufficiently numerous. *Id.* Here, Deoleo's records show that it has sold millions of bottles of the Products and the EVOO Products during the proposed class periods. (Simplicio Decl., Ex. 43.)

Courts have also held that classes also "must be adequately defined and clearly ascertainable." *See Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 482 (N.D. Cal. 2011) (internal quotation omitted). The "class definition must be sufficiently definite so that it is administratively feasible to determine whether a particular person is a class member." *Id.* However, "[t]here is no requirement that 'the identity of the class members…be known at the time of certification." *Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 536 (N.D.Cal.2012). "As long as the class definition is sufficiently definite to identify putative class members, the challenges entailed in the administration of [the] class are not so burdensome as to defeat certification." *Astiana v. Kashi Co.*, 291 F.R.D. 493, 536 (2013) (quoting *Ries*, 287 F.R.D. at 536). Here, the proposed Classes meet this standard; the IFI and EVOO classes are both plainly and succinctly defined.

In cases where food labels are challenged for false advertising, courts have routinely found similar definitions to satisfy the ascertainability requirement. *See, e.g., Forcellati v. Hyland's, Inc.*, 2014 WL 1410264, at *5 (C.D. Cal. Apr. 9, 2014) ("Plaintiffs have precisely defined their class based on an objective criteria: purchase of Defendants' children's cold or flu products within a prescribed time frame. This is enough to satisfy Rule 23(a)'s implied ascertainability requirement."); *Astiana,* 291 F.R.D. at 500 (holding in a food labeling case that the class was sufficiently ascertainable where "the proposed class definition simply identifies purchasers of Defendant's products that included the allegedly material misrepresentations").

While Deoleo may dispute ascertainabilty on the ground that there are no lists available of all purchasers, class membership need not be demonstrated by documentation, provided the definition is clear enough to permit self-identification. *See Rahman v. Mott's LLP*, 2014 WL 6815779, at *5 (N.D. Cal. Dec. 3, 2014) (where class was defined to exclude long periods of time during which the challenged definition did not appear on label, class was sufficiently ascertainable because "putative class members could know whether or not the challenged statement appeared on the label when they purchased apple juice."); *see also Lilly v. Jamba Juice Co.,* 2014 WL 4652283, at *4 (N.D. Cal. Sept. 18, 2014) ("Few people retain receipts for low-priced goods, since there is little possibility they will need to later verify that they made the purchase. Yet it is precisely in circumstances like these, where the injury to any individual consumer is small, but the cumulative injury to consumers as a group is substantial, that the class action mechanism provides one of its most important social benefits.").[11]

### 2.   Common Questions of Fact and Law Apply to Both Classes.

Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury." *Wal-Mart*, 131 S. Ct. at 2551 (quoting *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 157 (1982)). Otherwise put, class members' claims must depend upon a common contention that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one

---

[11] *Accord Ries v. Arizona Beverages USA LLC,* 287 F.R.D. 523, 535 (N.D. Cal. 2012) (holding, in a food labeling case, that the proposed class was ascertainable even in the absence of proofs of purchase because the class definition was objective and "[t]he challenges entailed in the administration of this class are not so burdensome as to defeat certification); *Allen v. Hyland's Inc.*, 300 F.R.D. 643, 659 (C.D. Cal. 2014) (holding in case challenging labeling of homeopathic drugs that "the Court is persuaded by . . . *Ries* and *Astiana* that the identity of class members need not be known at the time of class certification"). Deoleo will no doubt attempt to rely on the heightened ascertainability standard adopted by the Third Circuit in *Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013). But courts in this Circuit and around the country have repeatedly refused to adopt *Carrera*'s flawed reasoning. *See, e.g., Forcellati v. Hyland's, Inc.,* 2014 WL 1410264, at *5 (C.D. Cal. Apr. 9, 2014) (explaining why the reasoning employed by *Carrera* is flawed); *Rahman v. Mott's LLP*, 2014 WL 6815779, at *4 (N.D. Cal. Dec. 3, 2014) (collecting cases declining to adopt the reasoning in *Carrera*). *See also Mullins v. Direct Digital, LLC*, 795 F.3d 654, 658 (7th Cir. July 28, 2015) ("Nothing in Rule 23 mentions or implies this heightened requirement under Rule 23(b)(3), which has the effect of skewing the balance that district courts must strike when deciding whether to certify classes."); *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 525 (6th Cir. Aug. 20, 2015) ("We see no reason to follow *Carrera,* particularly given the strong criticism it has attracted from other courts.").

of the claims in one stroke." *Id.* Not all questions of fact and law need be common to satisfy the rule. *Id.; see also Mazza v. Honda American Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012) ("[C]ommonality only requires a single significant question of law or fact.").

Here, there are numerous legal and factual questions common to the Classes. The most crucial question is common to members of both Classes: were Defendant's uniform labels likely to deceive a reasonable consumer? As many courts have explained, "the primary evidence in a false advertising case is the advertising itself." *Williams v. Gerber Products Co.,* 553 F.3d 934, 938 (9th Cir. 2008), 938 (quoting *Brockey v. Moore* 107 Cal. App. 4th 86, 100 (2003)).  In cases alleging a deceptive advertising scheme under the UCL, CLRA, FAL, and common law fraud, it is well-settled that where "numerous consumers are exposed to the same dubious practice by the same seller [] proof of the prevalence of the practice as to one consumer would provide proof for all." *Vasquez v. Superior Court,* 4 Cal. 3d 800, 808 (1971). *See also In re Tobacco II Cases,* 46 Cal. 4th 298, 312 (2009) (holding that questions of materiality and the likelihood a representation will mislead a reasonable consumer predominate over individual issues); *Kasky v. Nike, Inc.,* 27 Cal. 4th 939, 951 (2002), *as modified* May 22, 2002 (explaining that the UCL and FAL "prohibit not only advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public") (internal citations omitted), *cited with approval in Williams,* 552 F.3d at 938 (same for CLRA).

For the IFI Class, another significant question is whether the "Imported from Italy" representation appearing on the front of the labels for all the Products violated state and federal labeling laws. Here, Plaintiff will first prove that the representation as it appears on the packaging violates the Tariff Act of 1930, 19 U.S.C. § 1304(a) and implementing regulations, 19 C.F.R. part 134, including 134.11 and 134.46, which sets forth specific requirements for when a company may label its products as "Imported from" any given country. Plaintiff will then prove that Defendant's packaging uniformly violates regulations promulgated by the Food and Drug Administration, which provide that food is misbranded if its label expresses or implies a geographical origin of the food or any ingredient of the food except when such representation is "[a] truthful representation of geographical origin." *See* 21 C.F.R. § 101.18. *See also* Cal. Health

& Saf. Code §§ 110100(a), 110380, 110505 (adopting FDA standards). The violation of any one of these regulations is sufficient to form the basis of Plaintiff's UCL claim under the "unlawful" prong. *Cel–Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.,* 20 Cal.4th 163, 180 (1999) ("By proscribing 'any unlawful' business practice, section 17200 'borrows' violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable"), quoted with approval in *Chabner v. United of Omaha Life Ins. Co.,* 225 F.3d 1042, 1048 (9th Cir. 2000); *Plascencia v. Lending 1st Mortgage,* 259 F.R.D. 437, 448 (N.D. Cal. 2009) ("Violation of almost any federal, state, or local law may serve as the basis for a UCL claim."), *order clarified,* 2011 WL 5914278 (N.D. Cal. Nov. 28, 2011).

Accordingly, commonality is met here as it was in *Astiani v. Kashi Company.* There, the court found that, "[b]y definition, all class members were exposed to such representations and purchased Kashi products, creating a 'common core of salient facts.'" 291 F.R.D. at 501 (citing *Ries,* 287 F.R.D. at 528). *Astiani* concluded that "[c]ourts routinely find commonality in false advertising cases." *Id.* (citing *Ries,* 287 F.R.D. at 537; *Chavez v. Blue Sky Natural Beverage Co.,* 268 F.R.D. 365, 377 (N.D. Cal. 2010); *In re POM Wonderful LLC Marketing & Sales Practices Litig.,* 2012 WL 4490860, at *1 (C.D. Cal. Sept. 28, 2012). It further explained that "variation among class members in their motivation for purchasing the product, the factual circumstances behind their purchase, or the price that they paid does not defeat" commonality. 291 F.R.D. at 502 (quoting *Ries,* 287 F.R.D. at 537).

### 3.   Plaintiff is Typical of Both Classes.

The purpose of the "typicality" requirement of Fed. R. Civ. P. 23(a)(3) is to ensure the named representative's interests "align" with those of the class. *See Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir. 1992). "[R]epresentative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical. Some degree of individuality is to be expected in all cases, but that specificity does not necessarily defeat typicality." *Hanlon,* 150 F.3d at 1020. Typicality is satisfied if the named plaintiff's claims stem from the same practice or course of conduct that forms the base of the

class claims and are based upon the same legal remedial theory. *Jordan v. Los Angeles Cnty.,* 669 F.2d 1311, 1321 (9th Cir.), *vacated on other grounds,* 459 U.S. 810 (1982).

Here, Plaintiff's claims are typical of those of the other Class members because he, like all Class members, purchased a Product that Deoleo marketed as being "Imported from Italy" and "Extra Virgin." (Simplicio Decl., Ex. 41 (Koller Tr.) at 58:3-5; 65:17-20, 69:5-10.) It is irrelevant that he did not purchase each Product covered by the class definition, because all the bottles of the Products covered by the IFI Class and the EVOO Class had the same false and deceptive "Imported from Italy" and "Extra Virgin" representations, respectively, appearing on the front panel. (Appendix B.) At the time of purchase, he believed that "Imported from Italy" meant that the olive oil was made entirely of olives grown and pressed in Italy, and that the oil was truly of "extra virgin" grade. (*Id.* at 41:23-42:2, 86:24-87:15, 124:7-12.) Under these circumstances, Plaintiff's claims are, at the very least, co-extensive with those of both Classes, and as such typicality is satisfied per Rule 23(a)(3).

### 4.   The Plaintiff Will Adequately Protect the Interests of the Classes.

Fed. R. Civ. P. 23(a)(4) requires that the class representative "fairly and adequately protect the interests of the class." The Ninth Circuit uses a two-prong test for this requirement: "(1) Do the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).

Here, Plaintiff will fairly and adequately protect the interests of the members of both Classes, because it is in his best interest to prosecute the claims alleged in the Complaint to obtain full compensation due to all members for the illegal conduct of which he complains. He has no conflict, let alone an irreconcilable conflict, with other class members. Rather, he stands in the same shoes as all other members of the Classes, seeks the same relief as other class members, and has a common interest in obtaining all of the relief sought.

Plaintiff's counsel have successfully represented numerous plaintiff classes, involving a variety of claims, in state and federal courts throughout the country. (Gutride Decl., Ex. 51; Zavareei Decl., Ex A.) Gutride Safier LLP has been involved (and appointed class counsel) in at

least fifteen class actions, including several cases relating to food and product mislabeling. (Gutride Decl., Ex. 50.) Tycko & Zavareei LLP has also successfully litigated numerous class actions in state and federal courts across the nation. Plaintiff's counsel have the necessary financial resources to vigorously litigate this action. (*Id.*; Zavareei Decl., Ex. A.)

### C.   The Class Satisfies the Requirements of Rule 23(b)(3).

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The predominance inquiry asks "whether proposed classes are sufficiently cohesive to warrant adjudication by representation. The focus is on the relationship between the common and individual issues." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1019 (9th Cir. 2011) (internal quotations and citation omitted)). This criterion is normally satisfied when there is an essential common factual link between all class members and the defendant, for which the law provides a remedy. *In re Visa Checks/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001).

#### 1.   Common Questions Predominate About Whether Deoleo's Representations Were Likely To Deceive Reasonable Consumers.

The UCL's "unfairness" prong and Plaintiff's CLRA, FAL and fraud-based claims prohibit conduct likely to mislead reasonable consumers. *See Williams*, 552 F.3d at 938 (under the CLRA and UCL, the "reasonable consumer standard" applies); *Lam v. Gen. Mills, Inc.*, 859 F. Supp. 2d 1097, 1104 (N.D. Cal. 2012) (defendant's use of the word "strawberries" might lead reasonable consumers to believe product is made with strawberries, not pears from concentrate).

Here, Deoleo made identical representations on all of its Products throughout the applicable class periods. All Products said "Imported from Italy" on the front of the package, with substantially similar, if not identical, disclaimers appearing in small font on the back of the package. (Appendix B; Simplicio Decl., Ex. 23, Interrogatory No. 9.) With respect to the EVOO Products, all bottles were identically advertised as "Extra Virgin." (Appendix B.) Because this packaging will serve as "primary evidence" on all of Plaintiff's claims, common factual questions predominates—i.e., would Defendant's "Imported from Italy" and/or EVOO representations

mislead reasonable consumers—the answer to which also will drive resolution of the case. *See Wal-Mart*, 131 S. Ct. at 2551. See also *Allen v. Hyland's Inc.*, 300 F.R.D. 643, 667 (C.D. Cal. 2014) (finding common questions to predominate where defendants used similar representations as to the products' effectiveness on all packaging).

Deoleo will likely argue that consumers would have different understandings of, and concern for, the representations. It will likely argue that some consumers did not read or care about the "Imported from Italy" front label, or understood the true countries of origin by reading the small print on the back. It may argue that some class members did receive "extra virgin" oil, because the oil in their bottle may not have degraded before they purchased or used it. It will probably also argue that consumers buy its olive oil for reasons unrelated to these labeling issues; for example, because they trust the brand name, like the taste, or think the price was good. These arguments will all be misguided, because under the UCL, "relief is available *without* individualized proof of deception, reliance and injury" by absent class members. *In re Tobacco II Cases,* 46 Cal. 4th at 320 (emphasis added). "[I]n effect, California has created what amounts to a conclusive presumption that when a defendant puts out tainted bait and a person sees it and bites, the defendant has caused an injury; restitution is the remedy." *Stearns*, 655 F.3d at 1021 n. 13. Here, the restitution will be valued as the difference between the price class members paid and the market price that would have existed had the products not said "extra virgin" and "from Italy." For these reasons, multiple courts have held that the presence of different motivators for purchase is an insufficient basis to deny certification. *See, e.g, id.* at 1022 (citing *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 129 (2009) ("That the defendant can establish a lack of causation as to a handful of class members does not necessarily render the issue of causation an individual, rather than a common, one.")); *Brown v. Hain Celestial Grp., Inc.,* 2014 WL 6483216, at *17 (N.D. Cal. Nov. 18, 2014) (rejecting premise that "there can be only one material trait that causes a person to buy a given product" and explaining that consumers "buy products all the time for more than one reason"); *Allen v. Hyland's Inc.*, 300 F.R.D. 643, 668 (C.D. Cal. 2014) (dismissing evidence that consumers had different primary motivators for purchasing product and finding predominance).[12]

---

[12] The UCL does require the *named plaintiff* to show that he was motivated by the mislabeling, but even in that context, "[i]t is not necessary that the plaintiff's reliance upon the truth of the

1   Likewise, hypothetically different individual consumer buying experiences do not defeat

2   certification of the CLRA or fraud-based claims. On those claims, even though there must be

3   proof of reliance by each class member, an inference (or presumption) of reliance arises as to the

4   entire class if the misrepresentation was uniform and material. *See In re Steroid Hormone Prod.*

5   *Cases,* 181 Cal. App. 4th 145, 156 (2010), *as modified on denial of reh'g* (Feb. 8, 2010) (plaintiff

6   entitled to show that defendant's conduct caused the same damage to the class by showing the

7   misrepresentation was material, even if defendant could show some class members would have

8   bought the product anyway); *Wolph v. Acer Am. Corp.*, 2012 WL 993531, *3 (N.D. Cal. Mar. 23,

9   2012) ("[T]he Court found that Plaintiffs' claims are premised on misrepresentations that were

10  made to the entire class. Therefore, common issues predominate on Plaintiffs' CLRA claim.");

11  *Delarosa v. Boiron, Inc.*, 275 F.R.D. 582, 594 (C.D. Cal. 2011) ("A determination by the trier of

12  fact that Coldcalm misrepresented its efficacy to Plaintiff will also resolve the common question

13  of whether Coldcalm misrepresented its efficacy to all California consumers of Coldcalm");

14  *Zeisel v. Diamond Foods, Inc.*, 2011 WL 2221113, *10 (N.D. Cal. June 7, 2011) (where plaintiff

15  can prove representations on label were material, he could establish an inference of reliance on

16  behalf of the class); *In re Brazilian Blowout Litig.*, 2011 WL 10962891, *8 (C.D. Cal. Apr. 12,

17  2011) (on fraud and negligent misrepresentation claims "reliance may be presumed as to the

18  entire Class if Defendant's misrepresentations or omissions were material").

19      Further, the question of whether the misrepresentation or omission is "material" under

20  California law is an objective one, depending on the "reasonable person" standard, and has long

21  been so. *See Stearns,* 655 F.3d at 1022; *see also Occidental Land, Inc. v. Superior Court*, 18 Cal.

22  3d 355, 363 (1976) (for common-law fraud class, reliance can be proven on common basis by

23  showing that misrepresentations were material); *Vasquez v. Superior Court*, 4 Cal. 3d 800, 814

24  (1971) (on fraud claim, "[i]f the court finds that a reasonable man would have relied upon the

25  alleged misrepresentations, an inference of justifiable reliance by each class member would

26  arise"); *In re Tobacco II Cases*, 46 Cal. 4th at 327 ("[a] misrepresentation is judged to be

27

28  fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing
his conduct. It is enough that the representation has played a substantial part, and so has been a
substantial factor, in influencing his decision." *In re Tobacco II Cases*, 46 Cal. 4th at 327.

Plaintiff's Motion for Class Certification

'material' if 'a reasonable man would attach importance to its existence or non-existence in determining his choice of action in the transaction' and as such materiality is generally a question of fact unless the fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it."). Because materiality is an objective standard common to all, and classwide reliance is inferred if the misrepresentations were material, the common question of materiality predominates.[13]

### 2. Whether Deoleo's Representations Are Unlawful Predominates For All Imported From Italy Class Members.

With respect to all of Deoleo's Products, common questions also predominate regarding whether Deoleo violated various federal and state regulations regarding country of origin, and if so, whether Deoleo has violated the unlawful prong of the UCL. *See Cel–Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.,* 20 Cal. 4th 163, 180 (1999) ("By proscribing 'any unlawful' business practice, section 17200 'borrows' violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable").

First, the common question of whether Deoleo's "Imported from Italy" representation violates "country of origin" regulations will predominate over any individual questions.[14] As set forth above, the alleged misrepresentation was identically placed on all of the Products, and the location, and relative sizing, of the purported disclaimer is also standardized across all of the Products. (Appendix B.) Title 19, section 134.46, of the Code of Federal Regulations prohibits Deoleo from using any name of a foreign country that "may mislead or deceive the ultimate purchaser as to the actual country of origin of the article," unless there appears "legibly and permanently *in close proximity* to such words, letters or name, and in at least a comparable size, the name of the [true] country of origin preceded by "Made in," "Product of," or other words of similar meaning." 19 C.F.R. § 134.46 (emphasis added). The U.S. Customs and Border Protection Service has ruled under this regulation that oils that are merely blended and bottled in Italy may

---

[13] In addition, the CLRA and common law fraud claims present the further common question of whether Deoleo intended to deceive consumers.

[14] Deoleo may argue for a second time that preemption bars such a claim, but this too is yet another common question.

Plaintiff's Motion for Class Certification

1  | not be labeled "Imported from Italy." (Simplicio Decl., Ex. 30 (Letter N130295, dated November

2  | 24, 2010).)[15] The United States Food and Drug Administration (the "FDA") has also promulgated

3  | regulations governing misbranding of food. The regulations provide that food is misbranded if its

4  | label expresses or implies a geographical origin of the food or any ingredient of the food except

5  | when such representation is "[a] truthful representation of geographical origin." *See* 21 CFR §

6  | 101.18; *see also* Sherman Food, Drug and Cosmetic Law, California Health and Safety Code

7  | ("Cal. Health & Saf. Code") § 109875, *et. seq.; see, e.g.,* Cal. Health & Saf. Code §§ 110100(a) ,

8  | 110380, 110505 (adopting FDA standards). Thus, a predominant, common question is whether

9  | Deoleo violated these regulations.[16]

**3.   Common Questions Predominate Across the Extra Virgin Class As To Whether Deoleo's Policies and Procedures Were Adequate To Ensure Consumers Actually Received True "Extra Virgin" Grade Olive Oil.**

Another predominant issue central to the resolution of all EVOO Class members' claims is whether Deoleo's policies and procedures would reasonably ensure that the oil it was selling as "extra virgin" would still be extra virgin at the point of sale and through the "best by" date. Deoleo will undoubtedly argue that individual questions predominate regarding whether any single bottle of EVOO that a class member purchased actually contained "extra virgin" oil. This is incorrect. Quoting this Court's opinion, Judge Rogers explained in a similar case:

> Kumar's theory of the claim does not require that she prove that the particular bottle of oil she purchased had, in fact, degraded to the point of not being extra virgin. ***Whether some bottle of olive oil might not have degraded, despite the mixing, packaging, and shipping defects alleged, does not defeat the claim. As stated in a similar action before Judge Seeborg of this court, "each consumer who purchases 'extra virgin' olive oil, is entitled to receive oil that meets that definition by design, not by happenstance."*** *Koller v. Deoleo,* 14–cv–2400–RS,

---

[15] Deoleo indicated in previous briefing that it intended to challenge the level of deference this Court should give to that advisory letter, but that too is simply another common, predominate question. *See Brown,* 2014 WL 6483216, at *15 (holding that the impact of "an opinion expressed in an administrative agency's letter . . . can also be adjudicated at one stroke for the whole class").

[16] Even if Deoleo proved that a portion of the Products were made exclusively from Italian olives, that would not defeat class certification. In *Brown,* 2014 WL 6483216 at *16, the plaintiff alleged that certain products were falsely advertised as "organic." *Id.* There, the defendant produced records to show that 4.3% of products within the class definition could be "non-actionable" due to the fact that they had sufficient levels of organic content. But because defendants' records could identify which products met that standard, the court held that individual issues did "not predominate over the several key shared issues that dominate this case. Nor did they create an impermissibly 'overbroad' class." *Id.*

1

> Order Denying Motion to Dismiss, Dkt. No. 48, at 6; *see also In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1165 (C.D. Cal. 2011) (even if defect not yet manifest, plaintiffs have sufficiently alleged economic loss because the product was alleged to have the defect and therefore economic loss was present from the time of purchase). If, as alleged here, the product will not meet the extra virgin standard by design, Kumar and other consumers who paid a premium for the product based upon the extra virgin representation state a cognizable injury.

2

3

4

*Kumar v. Salov N. Am. Corp.*, 2015 WL 457692, at *5 (N.D. Cal. Feb. 3, 2015) (emphasis

5

added). Plaintiff's expert has opined that Deoleo's policies and procedures for bottling, shipping,

6

handling, and distributing the oil are substandard and will not reasonably assure that the product

7

reasonably maintains its extra virginity at the time of sale, let alone through the date of expected

8

use. (Mailer Decl., ¶ 115.) *Cf. Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1174

9

(9th Cir. 2010) (reversing a denial of class certification; finding no requirement to demonstrate

10

that a "majority of proposed class members' vehicles manifested the results of the defect").

11

### 4.  Common Questions on Restitution and Damages Predominate Over Individual Issues.

12

13

> Plaintiff seeks restitution under the UCL, as well as damages under the CLRA and for

14

fraud, presenting further predominant common questions.[17] Deoleo may argue there is no

15

classwide basis to determine monetary relief, because there is no way to determine who would

16

have purchased had the labels differed, or how much they would have paid, as retail prices are set

17

by retailers and differ by date and location, and there are no centralized documents establishing

18

how much was paid by each class member. Deoleo may also argue that there is no way to account

19

for the relationship between the price each class member paid and the "value" that he or she may

20

have received. It will likely rely on the U.S. Supreme Court's decision in *Comcast v. Behrend*,

21

133 S. Ct. 1426 (2013), which decertified an antitrust class because plaintiffs had proposed no

22

theory of damages that was tied to their theory of classwide liability. *Id.* at 1433.

23

---

[17] Under the UCL, a court may grant restitution, *Colgan v. Leatherman Tool Group, Inc.*, 135 Cal.App. 4th 663, 694 (2006); Cal. Bus. & Prof.Code §§ 17203, 17535, an equitable remedy whose purpose is "to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1149 (2003); *see also Cortez v. Purolator Air Filtration Products Co.*, 23 Cal. 4th 163, 177 (2000). The form of restitutionary relief has two purposes: returning money unjustly taken from the class, and deterring the defendant from engaging in future violations. *See Colgan*, 135 Cal.App. 4th at 695. If restitution is awarded, it must be a "quantifiable sum," and the award must be supported by substantial evidence. *Id.* at 698. Under the CLRA and fraud-based claims, a consumer may recover actual damages, punitive damages and attorney fees. Cal. Civ. Code § 1780(a)(1),(5), (d); *id.* § 3294(a). The CLRA also provides for statutory damages of $5,000 for each act of false advertising to a person age 65 or older. Cal. Civ. Code §§ 1761(f)-(g), 1780(a)(4).

24

25

26

27

28

22

Deoleo's arguments should be rejected, as Plaintiff will be able to prove that everyone in the class paid a premium for the oil that would not have existed in the absence of the labeling misrepresentations. *See Colgan*, 135 Cal.App. 4th at 700 (plaintiffs may produce evidence that attaches a dollar value to the "consumer impact or advantage" caused by the unlawful business practices). The Ninth Circuit recently reaffirmed that such a methodology met the *Comcast* standard, explaining that the damages calculation "need not account for benefits received after purchase because the focus is on the value of the service at the time of purchase….[U]nder the UCL and FAL, the focus is on the difference between what was paid and what a reasonable consumer would have paid at the time of purchase without the fraudulent or omitted information." *Pulaski & Middleman, LLC v. Google, Inc.*, -- F.3d --, 2015 WL 5515617, at *6 (9th Cir. Sept. 21, 2015); *see also Levya v. Medline Industries, Inc.,* 716 F.3d 510, 513–14 (9th Cir. 2013) (*citing Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010)).

At this stage, Plaintiff need only demonstrate the existence of a viable damages model that makes use of common, class-wide evidence. *See Brown,* 2014 WL 6483216, at *19 ("The point for Rule 23 purposes is to determine whether there is an acceptable class-wide approach, not to actually calculate under that approach before liability is established."); *McCrary v. Elations Co., LLC,* 2014 WL 1779243, at *15 (C.D. Cal. Jan. 13, 2014) (certifying consumer class because plaintiff presented a viable damages model and "it is not necessary to show that his method will work with certainty at this time") (quoting *Chavez*, 268 F.R.D. at 379 (certifying consumer class because plaintiffs were able to demonstrate one potential measure of damages based on the premium price paid by consumers)); *see also Zeisel*, 2011 WL 2221113, *10 (accepting plaintiff's assertion for class certification purposes that "he will be able to prove the proper amount of restitution by relying on documents produced by [defendant] relating to net sales, profits, and costs, as well as retail prices of" the products at issue). Even if the amount of restitution owed to each class member differs, that is not a reason to deny certification, as the Ninth Circuit again reaffirmed in *Pulaski & Middleman*, 2015 WL 5515617, at *6 ("damage calculations alone cannot defeat class certification").

To measure the price premium that resulted from the false "Imported from Italy" and "extra virgin" claims, Plaintiff's economics expert, Colin Weir, proposes a widely accepted method, hedonic regression. (Weir Decl. ¶¶ 18-36.) *See In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1032 (C.D. Cal. 2015) (accepting Mr. Weir's proposed methodology of measuring damages in food labeling class action and concluding that plaintiffs demonstrated that "individual damages issues do not predominate over common questions")*; see also Pulaski & Middleman*, 2015 WL 5515617, at *8 ("In calculating damages, here restitution, California law 'requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation.'") (quoting *Marsu, B.V. v. Walt Disney Co.,* 185 F.3d 932, 938–39 (9th Cir. 1999)).[19]

### 5.   A Class Action Is Superior

Rule 23(b)(3) enumerates four factors to consider on "superiority": "(A) the interest of members of the class in individually controlling the prosecution ... of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by ... members of the class; (C) the desirability ... of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

Here, there is little to be gained by class members filing individual claims, because the amounts are only a few dollars per purchase. Judicial resources would be conserved by

---

[19] Even were the Court to conclude that there is no class wide method for determining the amount of monetary relief that should be repaid to the Class, it nonetheless still should certify the Class to seek injunctive relief under Rule 23(b)(2), and at a minimum, certify it pursuant to Rule 23(b)(4) for liability only. With regard to injunctive relief, Plaintiff seeks the removal of the phrase "extra virgin" from the EVOO Products, or alternatively, improved production, packaging, and distribution processes. Even if injunctive relief is unavailable, and even if common questions do not predominate because of damages issues, it would be appropriate to certify the class on liability issues only under Rule 23(b)(4). Similar liability-only classes were certified in cases involving allegedly defectively designed washing machines, where class members might be entitled to different remedies depending on whether the defect manifested in their machine. *See In re Whirlpool Corp. Front-Loading Washer Products Liab. Litig.*, 722 F.3d 838, 858-59 (6th Cir. 2013) *cert. denied,* 13-431, 2014 WL 684065 (U.S. Feb. 24, 2014) (finding certified class "will prevail or fail in unison" and classwide liability adjudication will be "more efficient" notwithstanding differences in damages); *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 798 (7th Cir. 2013) *cert. denied,* 13-430, 2014 WL 684064 (U.S. Feb. 24, 2014) (holding *Comcast* does not impact cases where a liability only class is certified); *In re High-Tech Employee Antitrust Litig.,* 985 F. Supp. 2d 1167, 1185-86 (N.D. Cal. Oct. 24, 2013) (citing *Whirlpool* and *Butler* with approval, and certifying liability-only class).

24

concentrating the action in a single suit. Finally, the adjudication of class claims would not be significantly more burdensome than if the matter were prosecuted individually, while the prosecution of individual remedies could establish inconsistent standards of conduct for Deoleo. "[A] class action has to be unwieldy indeed before it can be pronounced an inferior alternative . . . to no litigation at all." *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004); *Visa Checks/MasterMoney*, 280 F.3d at 140.

**IV.     CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that this Court grant his Motion for Class Certification.

Dated: October 29, 2015                  **GUTRIDE SAFIER LLP**

                                         _/s/ Adam J. Gutride_____
                                         Adam J. Gutride, Esq.
                                         Attorneys for Plaintiff