1   **GUTRIDE SAFIER LLP**
    ADAM J. GUTRIDE (State Bar No. 181446)
2   SETH A. SAFIER (State Bar No. 197427)
    MARIE MCCRARY (State Bar No. 262670)
3   KRISTEN G. SIMPLICIO (State Bar No. 263291)
    100 Pine Street, Suite 1250
4   San Francisco, CA 94111
    Telephone: (415) 639-9090
5   Facsimile:  (415) 449-6469
6
7   TYCKO & ZAVAREEI LLP
    HASSAN A. ZAVAREEI (State Bar No. 181547)
8   1828 L St. N.W., Suite 1000
    Washington, DC 20036
9   Telephone: (202) 973-0900
    Facsimile: (202) 973-0950
10
11  Attorneys for Plaintiffs

12              UNITED STATES DISTRICT COURT

13              NORTHERN DISTRICT OF CALIFORNIA

14                      SAN FRANCISCO

15
    SCOTT KOLLER, CAROLYN BISSON-          CASE NO. 3:14-cv-02400-RS
16  ETTE, CECE CASTORO, STEPHEN FRE-
    IMAN, DIANE GIBBS, DARLENE
17  WILLIAMS, and ROBERT GLIDEWELL,        SECOND AMENDED CLASS ACTION COM-
    on behalf of themselves, the general public   PLAINT FOR VIOLATION OF THE
18  and those similarly situated,           CALIFORNIA CONSUMERS LEGAL
                                           REMEDIES ACT; FALSE ADVERTISING;
19        Plaintiffs,                       FRAUD, DECEIT, AND/OR MISREPRESEN-
                                           TATION; AND UNFAIR BUSINESS PRAC-
20            v.                            TICES

21  DEOLEO USA, INC.,                       JURY TRIAL DEMANDED
22
          Defendant.
23

24
25
26
27
28

Scott Koller, Carolyn Bissonette, Cece Castoro, Stephen Freiman, Diane Gibbs, Darlene Williams, and Robert Glidewell (collectively, "Plaintiffs"), by and through their counsel, brings this Second Amended Class Action Complaint ("Class Action Complaint") against Defendant Deoleo USA, Inc.,[1] on behalf of himself and those similarly situated, for violations of the statewide consumer protection statutes, and common law fraud, deceit and/or misrepresentation. The following allegations are based upon information and belief, including the investigation of Plaintiffs' counsel, unless stated otherwise.

**INTRODUCTION**

1.     This case concerns Defendant's false and deceptive marketing and sale of olive oil.

a.     First, Defendant identically represents that all of its olive oil products are "**IMPORTED FROM ITALY**."  This leads consumers to reasonably believe that Defendant's olive oil products are made from olives grown and pressed in Italy, and contain no (or a negligible amount of) olives grown or pressed in other countries. In truth, Defendant's olive oil is not made entirely from olives that are grown, or even pressed, in Italy.  Rather, Defendant's olive oil includes a non-negligible amount of oils pressed (from olives grown) in other countries, and (at best) are trucked or shipped to Italy, bottled and then exported.[2]

b.     Second, Defendant labels some of its products as a particular grade of olive oil, namely "**Extra Virgin" Olive Oil**.  This representation is also false and misleading because, among other things, Defendant mixes refined oil in with their extra virgin olive oil and/or, for the predominant portion of the class period, bottled their olive oil in clear, non-ultraviolet protective bottles.  The use of clear bottles exposes the oil to sunlight and heat and causes chemical reactions inside the oil and causes it to oxidize, degrade and degenerate.  These inferior bottles,

---

[1] This Second Amended Complaint removes Med Foods, Inc.—which Defendant was previously known as—as a named party.

[2] Although Defendant changed its packaging to simply say "Imported" at approximately the end of 2015, this Second Amended Complaint continues to refer to Defendant's conduct in the present tense, as Plaintiffs seek injunctive relief barring Defendant from resuming the use of "Imported from Italy" labeling in the future.

1   which are used by Defendant for all of its extra virgin olive oil, do not preserve the

2   oil as "extra virgin."  Rather, the oil degrades during shipping and while it sits on

3   retailer shelves.  Even if the oil is "extra virgin" at the time of bottling, Defendant

4   knows that the oil will not qualify (and cannot be defined) as "extra virgin" at the

5   time it is sold to consumers.  Defendant's deception is compounded by providing a

6   "**Best if Used By**" date on each bottle that is approximately 18 months to 2 years

7   after the date of bottling, even though they know that the oil sold in their defective

8   bottles will not be "extra virgin" through the period specified.

9   ## PARTIES

10  2.      Scott Koller ("Koller" or "Plaintiff Koller") is, and at all times alleged in this Class

11  Action Complaint was, an individual and a resident of Brentwood, California.

12  3.      Carolyn Bissonette ("Bissonette" or "Plaintiff Bissonette") is, and at all times

13  alleged in this Class Action Complaint was, an individual and a resident of Windemere, Florida.

14  4.      Cece Castoro ("Castoro" or "Plaintiff Castoro") is, and at all times alleged in this

15  Class Action Complaint was, an individual and a resident of Riverhead, New York.

16  5.      Stephen Freiman ("Freiman" or "Plaintiff Freiman") is, and at all times alleged in

17  this Class Action Complaint was, an individual and a resident of Sewell, New Jersey.

18  6.      Diane Gibbs ("Gibbs" or "Plaintiff Gibbs") is, and at all times alleged in this Class

19  Action Complaint was, an individual and a resident of Jonesboro, Arkansas.

20  7.      Darlene Williams ("Williams" or "Plaintiff Williams") is, and at all times alleged

21  in this Class Action Complaint was, an individual and a resident of Warrenton, North Carolina.

22  8.      Robert Glidewell ("Glidewell" or "Plaintiff Glidewell") is, and at all times alleged

23  in this Class Action Complaint was, an individual and a resident of North Bay Village, Florida.

24  9.      Defendant Deoleo USA, Inc. ("Deoleo USA") is a corporation incorporated under

25  the laws of the State of Delaware, having its principal place of business in Houston, Texas.

26  Deoleo USA is a wholly owned subsidiary of Deoleo S.A.

27  ## JURISDICTION AND VENUE

28  10.     This Court has jurisdiction over the subject matter of this action pursuant to 28

-2-

U.S.C. § 1332(d)(2), because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which at least one member of the class (all Plaintiffs) is a citizen of a State different from the Defendant.

11.     This Court has subject matter jurisdiction over the Defendant because it regularly conducts and/or solicits business in, engage in other persistent courses of conduct in, and/or derive substantial revenue from products and/or services provided to persons in this District and in this State.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the State of California, including this District.  Defendant, in fact, sells more olive oil in the State of California that in any other state in the United States.

13.     In accordance with California Civil Code Section 1780(d), Plaintiff Koller has filed a declaration establishing that, in or around October of 2013, he purchased a bottle of Bertolli extra virgin olive oil in Brentwood, California.  (Plaintiff Koller's declaration is attached as Exhibit A to his original class action complaint. (Dkt.# 1).)

14.     Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## SUBSTANTIVE ALLEGATIONS

**A.     The Defendant**

15.     Deoleo USA is an importer, marketer and seller of Mediterranean food products in the United States.

16.     Deoleo USA is a wholly owned subsidiaries of Deoleo S.A., which claims to be the "No. 1 olive oil company in the world."

17.     Defendant imports, markets and sells, in the United States, three brands of olive oil: Bertolli, Carapelli, and Carbonell.

18.     Defendant contends that it systematically documents and certifies the origin and production of all of the olive oil that they sell.  It specifically states: "we are able to trace our products from the grove to the shelf.  This ensures quality and consistency at every stage of production."

**B.**     **Defendant's False and Deceptive Product Packaging**

19.     This case concerns Defendant's marketing and sale of their Bertolli and Carapelli brand olive oil products. The specific products as issue in this case are:

        a.     Bertolli Extra Virgin Olive Oil;

        b.     Bertolli Classico Olive Oil;

        c.     Bertolli Extra Light Tasting Olive Oil;

These products are collectively referred to as the "Mock Italian Products" or simply the "Products."

20.     Certain allegations in this case pertain only to Bertolli Extra Virgin Olive Oil products that were marketed and sold in clear glass bottles for the predominant portion of the class period.  That subset of products is referred to herein as the "Mock EVOO Products."

21.     This case focuses on Defendant's representations (1) on all the Mock Italian Products that the oil is "**IMPORTED FROM ITALY**" and (2) on all the Mock EVOO Products that the oil qualifies (or is graded) as "**EXTRA VIRGIN**."

22.     Through Defendant's use of intentional misrepresentations and selective omission, each of the above representations deceives and misleads consumers.

        a.     First, by stating "IMPORTED FROM ITALY," Defendant leads consumers to believe that these Products are made from olives grown and pressed in Italy, and contain no (or a negligible amount of) olives grown or pressed in other countries. Defendant's conduct is false and deceptive, because the Mock Italian Products are made from a substantial amount of olives grown and oil pressed in many countries other than Italy.  Although the olives and/or oil from those other countries may be trucked or shipped to Italy, blended with the oil from other countries and oil from Italy, bottled and then exported, the oil is not "Imported from Italy" but rather imported from a variety of countries and at best "packed" or "bottled" in Italy. Defendant charges a premium by deceiving customers into believing that their oil is of Italian origin.

        b.     Second, Defendant misleads and deceives consumers by representing (and

labelling) the Mock EVOO Products as "EXTRA VIRGIN"—i.e., the highest grade/quality of olive oil—when they know that due to their use of substandard, clear (non-light protective) bottles for the predominant portion of the class period, and unprotected transport methods and storage procedures, the oil will degrade such that it will not qualify as (or can be defined as) "extra virgin" olive oil at the time of sale and/or well before the "Best if Used By" date.  All of Defendant's Mock EVOO Products are deceptively misbranded.  Defendant charges a premium by deceiving customers into believing that their oil is of "extra virgin" grade.

**(1)    Defendant's False Origin Representations**

23.    Part 134, Chapter 1 of Title 19 of the Code of Federal Regulations sets forth regulations implementing the country of origin marking requirements and exceptions of section 304 of the Tariff Act of 1930, as amended (19 U.S.C. 1304), together with certain marking provisions of the Harmonized Tariff Schedule of the United States (19 U.S.C. 1202).

24.    19 C.F.R. § 134.46 requires that:
In any case in which…the name of any foreign country or locality other than the country or locality in which the article was manufactured or produced appear on an imported article or its container, and those words, letters or names may mislead or deceive the ultimate purchaser as to the actual country of origin of the article, there shall appear legibly and permanently in close proximity to such words, letters or name, and in at least a comparable size, the name of the country of origin preceded by "Made in," "Product of," or other words of similar meaning.

25.    All of Defendant's Mock Italian Products are marketed with labels in bold font that state "IMPORTED FROM ITALY," when the oil used in all of the Mock Italian Products is, in fact, the product of many countries.  Yet, Defendant, in violation of 19 C.F.R. § 134.46, does not include on the Mock Italian Products, "in close proximity" to the ""IMPORTED FROM ITALY" representation, any indication of the true country of origin of the olive oil preceded by "Made in," "Product of," or other words of similar meaning.  Instead, Defendant states only on the back labels appearing on all the Mock Italian Products, in much smaller font, a notation such as: "Product contains select high quality [olive oils] from the countries indicated by the letters below.  I=Italy, GR=Greece, E=Spain, TU=Tunisia, MA=Morocco, CL=Chile, AG=Argentina, AU=Australia" along with a dot matrix print of one or more country codes.  At no time does

1    Defendant disclose the percentages of oil from the listed countries or state that the percentage of

2    oil from countries other than Italy is substantial.

3            26.     The United States Food and Drug Administration (the "FDA") has also

4    promulgated regulations governing misbranding of food and providing that food is misbranded if

5    its label expresses or implies a geographical origin of the food or any ingredient of the food

6    except when such representation is "[a] truthful representation of geographical origin."  *See* 21

7    CFR § 101.18.  Because the "IMPORTED FROM ITALY" representation is not truthful,

8    Defendant's labels violate 21 CFR § 101.18, which has been independently adopted as part of the

9    Sherman Food, Drug and Cosmetic Law, California Health and Safety Code ("Cal. Health & Saf.

10   Code") § 109875, *et. seq.*  *See* Cal. Health & Saf. Code §§ 110100(a), 110380, 110505 (adopting

11   FDA standards).

12           27.     Under the Tariff Act and implementing regulations, in situations where a product

13   sold to consumers is composed of ingredients from various countries of origin, all the countries of

14   origin must be disclosed, and must appear in close proximity to any representation that the

15   product is "imported from" or "made in." § 19 C.F.R. 134.46. For example, in Letter N130295,

16   dated November 24, 2010, the CBP explained that a tin of olive oil, which stated "Imported from

17   Italy" prominently on the side panel, was in violation of the Tariff Act, because the olives were

18   pressed and grown elsewhere, and the company had only disclosed that fact by printing a key

19   identifying the true countries of origin in small font (similar to  the key used by Defendant)

20   towards the bottom of the side panel.

21           28.     An exception exists if the ingredients from various countries are "substantially

22   transformed" into a new product in a single country, in which case the country where the

23   substantial transformation occured can be claimed as the country of origin. 19 C.F.R. 134.1(b).

24   However, the blending or mixing together of ingredients from multiple countries does not

25   constitute a "substantial transformation."  See, e.g. Letter HQ 560944, dated April 27, 1998 ("it is

26   our opinion that the refining process in Italy does not result in a substantial transformation of the

27   crude olive oil imported into Italy from Spain"); Letter HQ 735085, dated June 4, 1993

28   (explaining that a package containing produce grown in various countries, transported to Mexico,

where it is mixed with produce grown in Mexico, did not undergo a substantial transformation in Mexico and must identify the countries of origin of all the components).

29.    In addition to violating the Tariff Act, the "Imported from Italy" statement on all the Mock Italian Product bottles mislead consumers, as they misled Plaintiffs, by prominently making an Italian origin claim on the front of the bottle, while placing in small print on the back of the bottle, cryptic information as to the actual non-Italian origin of the olive oil.  The disclaimer on the back of the bottle does not lessen Defendant's deception because, as the U.S. Court of Appeals for the Ninth Circuit has stated, "reasonable consumers…should [not] be expected to look beyond misleading representations on the front of the box to discover the truth from the…small print on the side of the box."  *Williams v. Gerber Products Co.,* 552 F.3d 934, 939 (9th Cir. 2008).

**(2)    Defendant's False "Extra Virgin" Respresentations**

30.    "Extra Virgin" olive oil is widely understood to mean the best (or highest) grade/quality of olive oil.  The term "Extra Virgin" is defined by the International Olive Council ("IOC"),[3] the United States Department of Agriculture ("USDA"), and the State of California, the United States' largest domestic olive oil producer.  The IOC, USDA, and State of California established chemistry and sensory standards for "extra virgin" olive oil.  Under each of these standards, "extra virgin" olive oil must have zero sensory defects and greater than zero fruitiness. Defendant's Mock EVOO Products inevitably fail each of these standards for "extra virgin" olive oil at the time of sale to consumers and/or prior to the "Best if Used By" date on the bottle.

31.    The IOC defines "Extra Virgin Olive Oil" as: virgin olive oil which has a free acidity, expressed as oleic acid, of not more than 0.8 grams per 100 grams.  The IOC utilizes a protocol for its sensory testing, which includes, but is not limited to, perception, sensation, and

---

[3] The IOC — an intergovernmental organization based in Madrid, Spain, with 16 member states plus the European Union — promotes olive oil around the world by tracking production, defining quality standards, and monitoring authenticity.  The IOC officially governs 95% of international production and holds great influence over the rest.  The USDA's olive oil standards are generally based upon the IOC's standards.

sensitivity.

32.     Since 1948, the USDA has regulated olive oil grades and, like the IOC, utilizes both chemical and sensory standards to determine quality.  USDA standards define "U.S. Extra Virgin Olive Oil" as: virgin olive oil which has excellent flavor and odor (median of defects equal to zero and median of fruitiness greater than zero) and a free fatty acid content, expressed as oleic acid, of not more than 0.8 grams per 100 grams.  The USDA additionally requires that the oil meets the additional requirements outlined in the United States Standards for Grades of Olive Oil and Olive-Pomace Oil, 75 FR 22363 (April 28, 2010), which sets forth the criteria to ascertain the grades of the oil using both chemical and sensory standards.

33.     The State of California defines "Extra Virgin Olive Oil" as: "virgin olive oil that has excellent flavor and odor expressed as a median of defects equal to zero and a median of fruitiness greater than zero, has a free fatty acid content, expressed as oleic acid, of not more than 0.8 grams per 100 grams oil, has a peroxide value of not more than 20 milliequivalent peroxide oxygen per kilogram oil and meets the additional chemical and sensory requirements for 'United States Extra Virgin Olive Oil' outlined in the United States Standards for Grades of Olive Oil and Olive-Pomace Oil published in the Federal Register that are in effect on October 25, 2010."  Cal. Health & Safety Code §§ 112877(a).[4]

34.     Even if a bottle of olive oil passes the minimum standards for EVOO at time of bottling, it will naturally degrade.  Thus olive oil must exceed minimum standards at time of bottling in order to remain EVOO through date of sale and use.

35.     In March of 2014, Plaintiffs' counsel had several bottles of Defendant's Mock EVOO Products tested by an independent, IOC-accredited laboratory and organoleptic evaluation panel.  Each bottle was purchased, in the Bay Area, at well-known California retail stores,

[4] Other states similarly define "extra virgin."  *See, e.g.,* New York (N.Y. Agric. & Mkts. Law § 204-a stating "'extra virgin olive oil' means virgin olive oil which has a free acidity, expressed as oleic acid, of not more than 0.8 grams per hundred grams.")); **Connecticut** (Regs. Conn. State Agencies § 21a-100-8 (stating "'extra virgin olive oil' means virgin olive oil which has a free acidity, expressed as oleic acid, of not more than 0.8 grams per hundred grams.")); **Oregon** (ORS 2011 vol. 13, § 616716 (adopting USDA standard).)

packed, and immediately shipped to that testing firm for analysis. The olive oil was tested prior to the "Best if Used By" date indicated by Defendant on the bottles. Additional testing was performed as described in the Declaration of Rodney Mailer and exhibits thereto, filed on October 29, 2015. (Dkt. Nos. 62-20 through 62-30.)

36.     The IOC-accredited laboratory and organoleptic evaluation panel determined that, contrary to Defendant's representations, none of the bottles of olive oil tested contained oil that qualified as "extra virgin" under the IOC, USDA, or State of California definitions.

37.     Defendant participated in the development of the IOC standards and is well aware of what they require. Indeed, Defendant has influenced the rule-making within the IOC to make it easier for Defendant to meet the "extra virgin" requirements. Nevertheless, as shown by the testing, by the IOC-accredited laboratory and organoleptic evaluation panel, the Mock EVOO Products it sold to Plaintiffs and class members still do not satisfy those standards.

38.     Defendant knows, or should have known, that the Mock EVOO Products it sells and markets, and which are labeled as "extra virgin," do not meet the state, national, or international standards for "extra virgin" when sold to consumers and/or during the entire "Best if Used By" period indicated on the bottles.

39.     Defendant has been aware of the fact that their olive oils do not meet the quality of "extra virgin" since at least June of 2010, when the University of California at Davis' Olive Oil Center released its report entitled "Tests indicate that imported 'extra virgin' olive oil often fails international and USDA standards" (the "Report"). The Report[5] evaluated olive oils, including those sold by Defendant, based on standards and testing methods established by the IOC and USDA, as well as several newer standards and testing methods adopted in Germany and Australia. The Report went on to note that the "samples failed extra virgin standards for reasons that include one or more of the following:

• oxidation by exposure to elevated temperatures, light, and/or aging;

• adulteration with cheaper refined olive oil;

---

[5] The tests relied upon in the Report were conducted by scientists at UC Davis and at the Australian Oils Research Laboratory, a governmental research center accredited by the IOC (the "Australian Laboratory").

- poor quality oil made from damaged and overripe olives, processing flaws, and/or improper oil storage."

40.     With specific regard to the Bertolli brand olive oil that was tested, the Report found that all three samples tested by UC Davis failed the chemical analysis and sensory assessment.

41.     It is a well-known in the olive oil industry that all olive oil must be stored in a cool and dark environment to preseve "extra virgin" qualities.  Heat and light cause chemical reactions inside the oil and causes it to degenerate into undesirable chemical products, thereby adulerating and degrading the oil. The ideal temperature at which to store EVOO is approximately 57 degrees Farhenheint, with degredation occuring even when stored at room temperature. In a 2012 study commissioned by the government of Australia, researchers found that the higher the temperature at which a bottle of EVOO was stored, the faster it deteriorated. For example, the Australian study found that for EVOO stored in the dark at room temperature, the oil's diacyclglycerol content fell below the established limit after six to twenty-four months, with the rate of deterioration increasing with exposure to higher temperatures.  The study also found that heat exposure had a similar impact on other attributes of the EVOO tested.

42.     For all of their Mock EVOO Products, Defendant does not take adequate steps to ensure the products remain at a safe temperature during transport or while on store shelves. Between the pressing stage and the time at which the consumer purchases the olive oil, all the Mock EVOO Products will have been subject to temperatures much higher than 57 degrees, further increasingly the likelihood that the Mock EVOO Products cease to become EVOO at the time of purchase and/or through the "Best if Used By" date.  For example, because Defendant's Mock EVOO Products are shipped and stored at temperatures much higher than room temperature prior to sale, the Mock EVOO Products' diacyclglycerol content will not meet proper standards for the entirety of the 18 month "Best if Used By" period.

43.     Exposure to light also causes EVOO to degrade faster.  For example, the 2012 Australian study found that light exposure had a significant effect of the sensory profile of EVOO stored in clear glass bottles.  And a 2007 study by researchers at the National Agricultural

Research Foundation, Institute of Technology of Agricultural Products, Greece and the Higher Technical Educational School, Department of Food Science, Thermi, Thessaloniki, Greece, of which Defendant is aware, concluded that olive oil exposed to light had significantly lower tocopherol, carotenoid and chlorophyll contents than did the same oils kept in the dark.  Overall, the results obtained showed that the shelf life of the oils exposed to light is shorter than that of oils kept in the dark, and that after only **two months** of exposure to light the oils examined could no longer be considered as "extra virgin."

44.    Defendant packed its Mock EVOO Products in clear bottles during the predominant portion of the class period and does not take steps to adequately protect the Mock EVOO Products from light degradation during shipping and once they reach stores.

45.    Indeed, Defendant does not have a policy for removing the Mock EVOO Products from store shelves after they have become degraded by light and heat, as well as other conditions. Further, Defendant indicates a "Best if Used By" date on the Mock EVOO Products that is eighteen months to two years after the oil is bottled – well beyond the two months it takes oil exposed to light and heat to degrade such that it is no longer "extra virgin."   As a result, all of the Mock EVOO Products are not "extra virgin" when they are sold to consumers and/or through the entire "Best if Used By" period indicated the bottles.  That is because: (1) it the Mock EVOO Products were sold in clear bottles during the predominant portion of the class period; (2) Defendant has failed to adopt policies and procedures to ensure that their Mock EVOO Products are protected from light and heat degredation during transport and while on store shelves; and/or (3) Defendant does not take proactive steps to remove old bottles of Mock EVOO Products from store shelves. Defendant knows that the Mock EVOO Products are not "extra virgin" when they are sold to consumers and/or through the entire "Best if Used By" period indicated the bottles, but they label and price the oil as "extra virgin" and include the "Best if Used By" date even though they know it to be untrue.

**C.    Defendant Compounds The Deception With Targeted Marketing and Advertising Campaigns**

46.    Over the past twenty years, extra virgin olive oil has become increasingly popular among consumers.  Defendant has advertised about, and the media has reported extensively on,

the health benefits of olive oil, with numerous media outlets covering studies suggesting that olive oil can lower cholesterol and risks of cancer.  Often these articles advise consumers that *extra virgin* olive oil is healthier than other kinds of olive oil.  *See, e.g.* http://www.npr.org/blogs/thesalt/2013/09/30/226844915/to-get-the-benefits-of-olive-oil-fresh-may-be-best and http://www.mindbodygreen.com/0-12906/6-great-reasons-to-fall-in-love-with-olive-oil.html, last accessed April 21, 2014.

47.     Because real extra virgin olive oil has a distinct flavor profile, chefs and food writers often recommend it for cooking over regular olive oil.  Its popularity surged over the last two decades, in part, because of the popularity of the Food Network channel, and the fact that many chefs appearing on that channel recommend it.  For example, Rachel Ray, a well known celebrity chef famous for easy to prepare meals, uses extra virgin olive oil so frequently in her television programs that she was credited with coining the "EVOO" acronym.  *See* http://en.wikipedia.org/wiki/Rachael_Ray, last accessed April 21, 2014.  Giada De Laurentiis, another popular Food Network host and celebrity chef, uses Italian extra virgin olive oil in her recipes, and regularly advises viewers and home cooks to buy *Italian extra virgin olive oil* in order to recreate her Italian dishes at home.  Mario Batali, a former Food Network chef, cookbook author, and current host of a popular daytime talk show, The Chew, has stated in his cookbooks and in numerous television programs that the best olive oil in the world comes from Italy.  He accordingly counsels consumers to only use extra virgin olive oil from Italy when cooking.

48.     Extra virgin olive oil is so frequently recommended by chefs that a search for "extra virgin olive oil" on www.foodnetwork.com, the website operated by the Food Network, brings up more than 8,500 recipes that call for extra virgin olive oil as an ingredient in the recipe. http://www.foodnetwork.com/search/search-results.recipes.html?searchTerm=%22extra+virgin+olive+oil%22&lastFilter=tab&_charset_=UTF-8, last accessed April 21, 2014.  Other popular recipe websites, such as allrecipes.com and epicurious.com similarly feature thousands of recipes calling for "extra virgin olive oil."

49.     Defendant unfairly and unlawfully attempts to capitalize on consumers' desire for Italian and extra virgin olive oil.  Defendant, in fact, has employed a variety of long-term

marketing and advertising campaigns and strategies to deceive consumers into believing that the Mock Italian Products are Italian and the Mock EVOO Products are high quality extra virgin olive oil. For example, Defendant has a partnership with a popular Italian celebrity chef Fabio Viviani, who they have named as their "brand ambassador." Viviani has designed recipes and cooking videos for Defendant's consumers to encourage them to use the (more expensive) "Extra Virgin Olive Oil" in recipes, particularly those for Italian food.

50.     Defendants also rely on social media to further their deception. For example, they operate a Facebook page—https://www.facebook.com/BertolliOliveOil/— that features pictures of Italy. The additionally inform their consumers, again falsely, that Defendants' Mock Italian Products are "made in a small town near Milan."



51.     Defendants also maintain a Twitter account, which also falsely advertises to consumers that their olive oils are from Lucca, Italy:

52.     Because of the false and misleading country of origin claims, Defendant is able to charge, and consumers pay, a higher price for all of the Mock Italian Products than would exist if those products were labeled in a truthful, non-deceptive manner.  Oil that is perceived to be Italian commands a higher price in the market than oil from other countries in Europe, North Africa, South America, Australia, and the Middle East, which are the true source of the most of the olives and oil in the Mock Italian Products.  Because of the false "extra virgin" claims, Defendant is able to charge, and consumers pay, a higher price for all of the Mock EVOO Products than would exist if those products were labeled in a truthful, non-deceptive manner.  Oil that is perceived to be extra virgin commands a higher price in the market than oil that is of lower grades, such as oridinary olive oil. For example, on Amazon.com, the seller Neptuns sells two 44

ounce bottles of Carapelli Extra Virgin Olive Oil for $59.99, but charges just $44.99 for the same amount of Carapelli Extra Light Olive Oil.  See http://www.amazon.com/Carapelli-Extra-Light-44-Ounce-Bottles/dp/B001EPQSY2/ref=sr_1_2?s=grocery&ie=UTF8&qid=1410459577&sr=1-2 (last accessed September 11, 2014) and http://www.amazon.com/Carapelli-Virgin-44-Ounce-Plastic-Bottles/dp/B001EPQRUC/ref=sr_1_1?s=grocery&ie=UTF8&qid=1410464136&sr=1-1 (last accessed September 11, 2014). When the oil in the Mock EVOO Products is sufficiently degraded, it would not even be salable as a food item as it would not meet standards for human consumption.

**D.     Defendant's Conduct Differs From That Of Its Competitors**

> **(1)     Defendant's Competitors' Disclosures Related to the Origin of Their Products**

53.     Unlike Defendant, who claims its Products are "IMPORTED FROM ITALY," certain of their competitors state that their olive oil products are "PACKED IN ITALY" or "BOTTLED IN ITALY" or make no claim on the front of the package about the place of manufacture.  For example, one of Defendant's competitors in the olive oil market is Violi brand olive oil.  Violi sells its olive oil for lower prices that Defendant's comparable products.  It states "PACKED IN ITALY" on its bottles.  Trader Joe's bottles of olive oil, which the company also sells for a lower cost than Defendant's olive oils, too state "PACKED IN ITALY."   Other of Defendant's olive oil competitors, including Rizzoli, state on bottles that the olive oil is "BOTTLED IN ITALY."  Other companies, such as Star brand olive oil, make no reference on the front of the package of the geographic origin of their olive oil, unless the oil is, in fact, made from olives that are grown and pressed in that country, state or region. At Safeway in Berkeley, California, a bottle of Bertolli Extra Virgin Olive Oil sells for $9.79, whereas a bottle of Star brand Extra Virgin Olive Oil sells for $8.99. Other of Defendant's competitors, like Pompeian olive oil, simply state, on the primary label panel, that the olive oil is "IMPORTED" without reference to any geographical region.

> **(2)     Defendant's Competitors Use Bottles Better Designed to Prevent Degradation of Their Olive Oil**

54.     Unlike Defendant, many of its competitors bottle all of their olive oils in bottles that are designed to better maintain the quality of the oil inside the bottles.  For example,

California Olive Ranch olive oils are bottled in green glass to prevent exposure to light.  Castillo de Piñar Olive Oil is bottled in violet glass bottles, which preserve the "organoleptic qualities" of the company's olive oils.  And, Colavita, a large manufacturer of olive oil, and one of Defendant's main competitors, bottles its olive oil in dark greenish glass.  Indeed, following the release of the results of the UC Davis Report, Colavita, unlike Defendant, made the decision to change to dark glass bottles, even if it cost them more and reduced sales.  Its CEO, Enrico Colavita, stated: "Even if consumers want to see the color of the olive oil, we are moving to all dark bottles."  *See* http://www.oliveoiltimes.com/olive-oil-basics/world/colavita-davis-olive-oil-study/7186 (last visited, April 21, 2014.)

**PLAINTIFFS' EXPERIENCE**

55.     In or around October of 2013, Plaintiff Koller desired to purchase imported extra virgin olive oil from Italy.

56.     Prior to purchasing Defendant's Bertolli brand extra virgin olive, Plaintiff Koller reviewed the packaging to satisfy himself that he was purchasing extra virgin olive oil from Italy. Plaintiff Koller specifically reviewed Defendant's statements on the front of the package that the product was "extra virgin" and "Imported from Italy."  Plaintiff Koller relied on Defendant's affirmative disclosures to believe he was purchasing olive oil that was both extra virgin and made from olives that were grown and pressed in Italy.  Plaintiff Koller also relied on Defendant's failure to adequately disclose that by "Imported from Italy" it meant merely that it was "packed" or "bottled" in Italy and that in fact, the oil was made in and imported from various countries other than Italy.  As Plaintiff Koller saw nothing on the front of the bottle to arouse his suspcion that the oil was anything other than purely of Italian origin, Plaintiff Koller did not look for or see additional information about the country of origin on the back of the bottle. Plaintiff Koller purchased Defendant's Bertolli extra virgin olive oil from a Safeway supermarket in Brentwood, California for approximately $12.00.

57.     The bottle of olive oil Plaintiff Koller purchased was marked on the back of the bottle "Best if Used By" March 31, 2015. Plaintiff Koller does not specifically recall reviewing this statement before purchase but he did intend to use the oil for a period of several months after

purchase. The product that Plaintiff Koller purchased was not extra virgin at the time of purchase and certainly not for the period through the "Best if Used By" date or even during the period during which he reasonably expected or would be likely to use it.  The product Plaintiff Koller purchased also was not of Italian origin but rather was substantially made from olives grown and pressed outside Italy.  Had Defendant not misrepresented (by omission and commission) the true nature of the olive oil, Plaintiff Koller would not have purchased Defendant's product or, at a very minimum, he would have paid less for the product that he purchased.

58.     Plaintiff Koller intends to make additional purchases of olive oil, including brands that are or may be owned by Defendant.  Plaintiff Koller has no way to determine prior to his purchases whether the oil sold and labeled "Imported from Italy" is in fact Italian or rather has a substantial amount of oil from olives grown and/or pressed in other countries.  He also has no way to determine Italy and whether oils labelled "extra virgin" actually meet the standards of that grade.  Thus, in the absence of the injunctive relief requested in this Complaint, Plaintiff Koller is likely to be deceived in the future and to suffer additional harm.

59.     Plaintiff Bissonette has been purchasing Bertolli Extra Virgin Olive Oil for over ten years.  Plaintiff Bissonette relied on Defendant's affirmative disclosures to believe she was purchasing olive oil that was both extra virgin and made from olives that were grown and pressed in Italy. She also relied on Defendant's failure to adequately disclose that by "Imported from Italy" it meant merely that it was "packed" or "bottled" in Italy and that in fact, the oil was made in and imported from various countries other than Italy.

60.     Plaintiff Castoro has been purchasing Bertolli Extra Virgin Olive Oil for over fifteen years.  Plaintiff Castoro relied on Defendant's affirmative disclosures to believe she was purchasing olive oil that was both extra virgin and made from olives that were grown and pressed in Italy. She also relied on Defendant's failure to adequately disclose that by "Imported from Italy" it meant merely that it was "packed" or "bottled" in Italy and that in fact, the oil was made in and imported from various countries other than Italy.

61.     Plaintiff Freiman has consistently purchased approximately six to eight (6-8) bottles of Bertolli Extra Virgin Olive Oil per year for over the last twenty years.  He relied on

Defendant's affirmative disclosures to believe he was purchasing olive oil that was both extra virgin and made from olives that were grown and pressed in Italy. Plaintiff Freiman also relied on Defendant's failure to adequately disclose that by "Imported from Italy" it meant merely that it was "packed" or "bottled" in Italy and that in fact, the oil was made in and imported from various countries other than Italy. As Plaintiff Freiman saw nothing on the front of the bottle to arouse his suspicion that the oil was anything other than purely of Italian origin, he did not look for or see additional information about the country of origin on the back of the bottle.

62.     Plaintiff Gibbs has been purchasing Bertolli Extra Virgin Olive Oil since 2007 as a healthier alternative to other cooking oils due to her husband's heart attack.  Plaintiff Gibbs relied on Defendant's affirmative disclosures to believe she was purchasing olive oil that was both extra virgin and made from olives that were grown and pressed in Italy.  She also relied on Defendant's failure to adequately disclose that by "Imported from Italy" it meant merely that it was "packed" or "bottled" in Italy and that in fact, the oil was made in and imported from various countries other than Italy.

63.     Plaintiff Williams has been purchasing Bertolli brand Extra Virgin Olive Oil and Classico Olive Oil since 2010 from Costco and Kroger stores located in Durham, North Carolina. Plaintiff Williams relied on Defendant's affirmative disclosures to believe she was purchasing olive oil that was both extra virgin (in the case of Bertolli Extra Virgin Olive Oil) and made from olives that were grown and pressed in Italy.  She also relied on Defendant's failure to adequately disclose that by "Imported from Italy" it meant merely that it was "packed" or "bottled" in Italy and that in fact, the oil was made in and imported from various countries other than Italy.  As Plaintiff Williams saw nothing on the front of the bottle to arouse her suspicion that the oil was anything other than purely of Italian origin, she did not look for or see additional information about the country of origin on the back of the bottle.

64.     Plaintiff Glidewell has been purchasing Bertolli Extra Virgin Olive Oil for over 10 years. Plaintiff Glidewell specifically relied on Defendant's affirmative disclosures to believe he was purchasing olive oil that was both extra virgin and made from olives that were grown and pressed in Italy.  He also relied on Defendant's failure to adequately disclose that by "Imported

1   from Italy" it meant merely that it was "packed" or "bottled" in Italy and that in fact, the oil was

2   made in and imported from various countries other than Italy.  As Plaintiff Gildwell saw nothing

3   on the front of the bottle to arouse his suspicion that the oil was anything other than purely of

4   Italian origin, he did not look for or see additional information about the country of origin on the

5   back of the bottle.

6                                    **CLASS ALLEGATIONS**

7          65.    Plaintiffs bring this action against Defendant on behalf of themselves and all

8   others similarly situated, as a class action pursuant to Rule 23, section 382 of the California Code

9   of Civil Procedure and section 1781 of the California Civil Code.  Plaintiffs seek to represent the

10  following groups of similarly situated persons, defined as follows:

11          **Extra Virgin Class**: All persons who from May 23, 2010, to the present, pur-
            chased, in the United States, any Bertolli Extra Virgin Olive Oil product, ex-
12          cept for purpose of resale.

13          **Imported from Italy Class**: All persons who from May 23, 2010 through
            December 31, 2015, inclusive, purchased, in the United States, Bertolli Extra
14          Virgin Olive Oil, Bertolli Classico Olive Oil and/or Bertolli Extra Light Olive
            Oil, except for purpose of resale.[6]

15          66.    This action has been brought and may properly be maintained as a class action

16  against Defendant pursuant to the provisions of Rule 23, California Code of Civil Procedure

17  section 382 and section 1781 of the California Civil Code because there is a well-defined

18  community of interest in the litigation and the proposed class is easily ascertainable.

19          67.    Numerosity:  Plaintiffs do not know the exact size of the classes, but it is estimated

20  that each is composed of more than 100 persons.  The persons are so numerous that the joinder of

21  all such persons is impracticable and the disposition of their claims in a class action rather than in

22  individual actions will benefit the parties and the courts.

23          68.    Common Questions Predominate:  This action involves common questions of law

24  and fact to the potential classes because each class member's claim derives from the deceptive,

25

26  [6] Specifically excluded from Plaintiffs' proposed Classes are (1) the Honorable Richard Seeborg,
    Joseph C. Spero, and Edward Infante (ret.), and any member of their immediate families; (2) any
27  government entity, (3) Defendant; (4) any entity in which Defendant has a controlling interest; (5)
    any of Defendant's subsidiaries, parents, affiliates, and officers, directors, employees, legal repre-
28  sentatives, heirs, successors, or assigns; and (6) any persons who timely opt-out of the proposed
    Classes.

unlawful and/or unfair statements and omissions that led Defendant's customers to believe that the Products were (or at a minimum contained olives) from Italy, and/or extra virgin.  The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the classes to recover.  Among the common questions of law and fact are:

a)      Whether Defendant's Products were pressed in Italy and/or made from olives grown and pressed in Italy, and contain no (or a negligible amount of) olives grown or pressed in other countries;

b)      Whether Defendant's Mock EVOO Products qualify at time of sale and through the "Best if Used By" date as "extra virgin olive oil" as that term is commonly understood and/or legally defined;

c)      Whether Defendant unfairly, unlawfully and/or deceptively failed to inform class members that its Products were not Italian or "extra virgin," as of the purchase date and/or the "Best if Used By" date on the labels;

d)      Whether Defendant misled class members by, *inter alia*, representing that their Products were "Imported from Italy" and "Extra Virgin" Olive Oil;

e)      Whether Defendant's advertising and marketing regarding its Products sold to class members was likely to deceive class members or was unfair;

f)      Whether Defendant's practices for distributing the Mock EVOO Products were inadequate or defective to preseve the "extra virgin" quality of the oil;

g)      Whether Defendant engaged in the alleged conduct knowingly, recklessly, or negligently;

h)      The amount of revenues and profits Defendant received and/or the amount of monies or other obligations lost by class members as a result of such wrongdoing;

i)      Whether class members are entitled to injunctive and other equitable relief and, if so, what is the nature of such relief; and

j)      Whether class members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the

nature of such relief.

69.     Typicality:  Plaintiffs' claims are typical of the members of both Classes because, during the class periods, they each purchased at least one of the Products, namely Defendant's Bertolli Extra Virgin Olive Oil, in reliance on Defendant's misrepresentations and omissions that it was "extra virgin" and "Imported from Italy."  Thus, Plaintiffs and the class members sustained the same injuries and damages arising out of Defendant's conduct in violation of the law.  The injuries and damages of each class member were caused directly by Defendant's wrongful conduct in violation of law as alleged.

70.     Adequacy:  Plaintiffs will fairly and adequately protect the interests of all class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which he complains.  Plaintiffs also have no interests that are in conflict with or antagonistic to the interests of class members.  Plaintiffs have retained highly competent and experienced class action attorneys to represent his interests and that of the classes.  By prevailing on their own claim, Plaintiffs will establish Defendant's liability to all class members.  Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for class members.

71.     Superiority:  There is no plain, speedy, or adequate remedy other than by maintenance of this class action.  The prosecution of individual remedies by members of the classes will tend to establish inconsistent standards of conduct for the Defendant and result in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties.  Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions world engender.  Furthermore, as the damages suffered by each individual member of the class may be relatively small, the expenses and burden of individual litigation would make it difficult

1    or impossible for individual members of the class to redress the wrongs done to them, while an

2    important public interest will be served by addressing the matter as a class action.

3          72.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the

4    management of this action that would preclude its maintenance as a class action.

5    <u>**CAUSES OF ACTION**</u>

6          73.    Plaintiffs do not plead, and hereby disclaims, causes of action under the Food Drug

7    and Cosmetic Act ("FDCA") and regulations promulgated thereunder by the FDA.  If failure to

8    do so would cause any of his claims to be preempted, Plaintiffs also disclaim causes of action

9    under the Tariff Act and regulations promulgated by the USDA, IOC and/or CBP.   Plaintiffs rely

10   on these regulations only to the extent such laws and regulations have been separately enacted as

11   state law or regulations or provide a predicate basis of liability under the state and common laws

12   cited in the following causes of action.

13   **PLAINTIFFS' FIRST CAUSE OF ACTION**
14   **(Violation of the Consumer Protection Acts of 50 States and the District of Columbia)**
     **On Behalf of Themselves, Extra Virgin Cass, and the Imported from Italy Class**

15         74.    Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action

16   Complaint as if set forth herein.

17         75.    Plaintiffs bring this claim on behalf of the Classes for violation of the consumer

18   protection acts of each of the States of the United States, and the District of Columbia.

19         76.    Plaintiffs bring these statutory consumer protection claims pursuant to the

20   substantially similar "Consumer Protection Acts" identified below, all of which were enacted and

21   designed to protect consumers against unlawful, fraudulent, and/or unfair business acts and

22   practices.

23         77.    The following consumer protection acts are collectively referred to herein as the

24   "Consumer Protection Acts":

25         a.    ALA. CODE § 8-19-1 et seq. (Alabama);

26         b.    ALASKA STAT. ANN. § 45.50.471 et seq. (Alaska);

27         c.    ARIZ. REV. STAT. ANN. § 44-1521 et seq. (Arizona);

28

d.  ARK. CODE ANN. § 4-88-101 et seq. (Arkansas);

e.  CAL. BUS. & PROF. CODE § 17200 et seq. and CAL. CIV. CODE §1750 et seq. (California);

f.  COLO. REV. STAT. ANN. § 6-1-101 et seq. (Colorado);

g.  CONN. GEN. STAT. ANN. § 42-110a et seq. (Connecticut);

h.  DEL. CODE ANN. tit. 6, § 2511 et seq. (Delaware);

i.  D.C. CODE ANN. § 28-3901 et seq. (District of Columbia);

j.  FLA. STAT. ANN. § 501.201 et seq. (Florida);

k.  GA. CODE ANN. § 10-1-370 et seq. and GA. CODE ANN. § 10-1-390 et seq. (Georgia);

l.  HAW. REV. STAT. ANN. § 480-1 et seq. and HAW. REV. STAT. ANN. § 481A-1 et seq. (Hawai'i);

m.  IDAHO CODE ANN. § 48-601 et seq. (Idaho);

n.  815 ILCS 505/1 et seq. (Illinois);

o.  IND. CODE ANN. § 24-5-0.5-0.1 et seq. (Indiana);

p.  IOWA CODE § 714.16 et seq.

q.  KAN. STAT. ANN. § 50-623 et seq. (Kansas);

r.  KY. REV. STAT. ANN. § 367.110 et seq. (Kentucky);

s.  LA. STAT. ANN. § 51:1401 et seq. (Louisiana);

t.  ME. REV. STAT. tit. 5, § 205-A et seq. (Maine);

u.  MD. CODE ANN., COM. LAW § 13-101 et seq. (Maryland);

v.  MASS. GEN. LAWS ANN. ch. 93A, § 1 et seq. (Massachusetts);

w.  MICH. COMP. LAWS ANN. § 445.901 et seq. (Michigan);

x.  MINN. STAT. ANN. § 325F.68 et seq., MINN. STAT. ANN. § 325D.09 et seq., MINN. STAT. ANN. § 325D.43 et seq., and MINN. STAT. ANN. § 325F.67 (Minnesota);

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

y.      MISS. CODE ANN. § 75-24-1 et seq. (Mississippi);

z.      MO. ANN. STAT. § 407.010 et seq. (Missouri);

aa.     MONT. CODE ANN. § 30-14-101 et seq. (Montana);

bb.     NEB. REV. STAT. ANN. § 59-1601 et seq. (Nebraska);

cc.     NEV. REV. STAT. ANN. § 41.600 and NEV. REV. STAT.
        ANN. §598.0903 et seq. (Nevada);

dd.     N.H. REV. STAT. ANN. § 358-A:1 et seq. (New Hamp-
        shire);

ee.     N.J. STAT. ANN. § 56:8-1 et seq. (New Jersey);

ff.     N.M. STAT. ANN. § 57-12-1 et seq. (New Mexico);

gg.     N.Y. GEN. BUS. LAW. § 349 et seq. (New York);

hh.     N.C. GEN. STAT. ANN. § 75-1 et seq. (North Carolina);

ii.     N.D. CENT. CODE ANN. § 51-15-01 et seq. (North Da-
        kota);

jj.     OHIO REV. CODE ANN. § 1345.01 et seq. (Ohio);

kk.     OKLA. STAT. ANN. tit. 15, § 751 et seq. (Oklahoma);

ll.     OR. REV. STAT. ANN. § 646.605 et seq. (Oregon);

mm.     73 PA. STAT. ANN. § 201-1 et seq. (Pennsylvania);

nn.     6 R.I. GEN. LAWS ANN. § 6-13.1-1 et seq. (Rhode Island);

oo.     S.C. CODE ANN. § 39-5-10 et seq. (South Carolina);

pp.     S.D. CODIFIED LAWS § 37-24-1 et seq. (South Dakota);

qq.     TENN. CODE ANN. § 47-18-101 et seq. (Tennessee);

rr.     TEX. BUS. & COM. CODE ANN. § 17.41 et seq. (Texas);

ss.     UTAH CODE ANN. § 13-11-1 et seq. (Utah);

tt.     VT. STAT. ANN. tit. 9, § 2451 et seq. (Vermont);

uu.     VA. CODE ANN. § 59.1-196 et seq. (Virginia);

Second Amended Class Action Complaint

1

vv.     WASH. REV. CODE ANN. § 19.86.010 et seq. (Washing-
        ton);

2

3

ww.     W.VA. CODE ANN. § 46A-6-101 et seq. (West Virginia);

4

xx.     WIS. STAT. ANN. § 100.20 (Wisconsin); and

5

yy.     WYO. STAT. ANN. § 40-12-101 et seq. (Wyoming).

6

78.     Plaintiffs and the Class members have standing to assert claims under the

7

Consumer Protection Acts because they are consumers within the meaning of the Consumer

8

Protection Acts and Defendant's practices were addressed to the market generally and otherwise

9

implicate consumer protection concerns.

10

79.     Defendant has engaged in unfair, unlawful and deceptive trade practices by

11

engaging in the unfair, deceptive and unlawful business practices outlined in this Class Action

12

Complaint.   In particular, Defendant has engaged, and continue to engage, in unfair, unlawful

13

and deceptive trade practices by, without limitation, the following:

14

a.      deceptively representing to Plaintiffs, and those similarly situated, the

15

Products were "Imported From Italy," therey implying that they were comprised wholly of olives

16

grown and pressed in Italy;

17

b.      deceptively representing to Plaintiffs, and those similarly situated, the

18

Mock EVOO Products were of a certain quality or grade—i.e., extra virgin—at the time of sale

19

and would remain "extra virgin" until the "Best if Used By" date;

20

c.      failing to adequately inform Plaintiffs, and those similarly situated, that the

21

Products were not and did not exclusively contain oil from Italian olives;

22

d.      failing to adequately inform Plaintiffs, and those similarly situated, that the

23

Products were not and did not exclusively contain oil that was pressed in Italy;

24

e.      failing to adequately inform Plaintiffs, and those similarly situated, that the

25

Products were merely bottled or packed in Italy;

26

f.      failing to inform Plaintiffs, and those similarly situated, that due to

27

Defendant's defective and inferior bottles, and substandard shipping and handling methods, the

28

Mock EVOO Products were not the represented quality or grade—i.e., they were no longer extra

virgin oilve oil—at the time of sale and/or would not maintain "extra virgin" quality until the "Best if Used By" date on the bottle;

        g.      engaging in fraud, deceit, and misrepresentation as described herein;

        h.      being unjustly enriched, as described herein;

80.      Defendant intended that Plaintiffs and the Class members would rely on the unlawful, fraudulent, and/or unfair business acts and practices alleged herein.

81.      Plaintiffs and those similarly situated relied to their detriment on Defendant's unfair, deceptive and unlawful business practices.  Had Plaintiffs and those similarly situated been adequately informed and not deceived by Defendant, they would have acted differently by not purchasing (or paying less for) Defendant's Products.

82.      Defendant's acts and omissions are likely to deceive the general public.

83.      Defendant's actions, which were willful and wanton, constitute intentional violations of the Consumer Protection Acts.

84.      Defendant engaged in these unfair practices to increase its profits.

85.      Accordingly, Defendant has engaged in unlawful trade practices, as defined and prohibited by the Consumer protection Acts.

86.      The aforementioned practices, which Defendant has used to their significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendant's competitors as well as injury to the general public.

87.      Plaintiffs seek, on behalf of those similarly situated, full damages, as necessary and according to proof, to restore any and all monies acquired by Defendant from Plaintiffs, the general public, or those similarly situated by means of the unfair and/or deceptive trade practices complained of herein, plus interest thereon. Plaintiffs also seek to recover attorneys' fees, costs, and expenses to be assessed against Defendant, within the limits set forth by applicable law.

88.      Plaintiffs seek, on behalf of those similarly situated, an injunction to prohibit Defendant from continuing to engage in the unfair trade practices complained of herein.

89.      Plaintiffs and those similarly situated are further entitled to and do seek both a declaration that the above-described trade practices are unfair, unlawful and/or fraudulent, and

injunctive relief restraining Defendant from engaging in any of such deceptive, unfair and/or unlawful trade practices in the future.  Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate Consumer Protection Acts, unless specifically ordered to comply with the same.  This expectation of future violations will require current and future customers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which Defendant is not entitled. Plaintiffs, those similarly situated and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the Consumer Protection Acts alleged to have been violated herein.

90.     As a direct and proximate result of such actions, Plaintiffs and the other members of the Classes have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive, unfair and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.   Among other things, Plaintiffs and the Classes lost the amount they paid for the Products.

91.     As a direct and proximate result of such actions, Defendant has enjoyed, and continue to enjoy, significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

**PLAINTIFFS' SECOND CAUSE OF ACTION**
**(Unjust Enrichment)**
**On Behalf of Themselves, the Extra Virgin Class, and the Imported from Italy Class**

92.     Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

93.     By means of Defendant's wrongful conduct alleged herein, Defendant knowingly sold Mock EVOO and Mock Italian Products to Plaintiffs and members of the Classes in a manner that was unfair, unconscionable, and oppressive.

94.     Defendant knowingly received and retained wrongful benefits and funds from Plaintiffs and members of the Classes. In so doing, Defendant acted with conscious disregard for

the rights of Plaintiffs and members of the Classes.

95. As a result of Defendant's wrongful conduct as alleged herein, Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the Classes.

96. Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

97. Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to be permitted to retain the benefits it received, without justification, from selling Mock EVOO and Mock Italian Products to Plaintiffs and members of the Classes in an unfair, unconscionable, and oppressive manner. Defendant's retention of such funds under such circumstances making it inequitable to do so constitutes unjust enrichment.

98. The financial benefits derived by Defendant rightfully belong to Plaintiffs and members of the Classes. Defendant should be compelled to return in a common fund for the benefit of Plaintiffs and members of the Classes all wrongful or inequitable proceeds received by them.

99. Plaintiffs and members of the Classes have no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the members of the Classes, respectfully request the Court to enter and Order:

A. certifying the proposed Classes;

B. declaring that Defendant is financially responsible for notifying the Class members of the pendency of this suit;

C. declaring that Defendant has committed the violations of law alleged herein;

D. providing for any and all injunctive relief the Court deems appropriate;

E. awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount that the Court or jury will determine, in accordance with applicable law;

F. providing for any and all equitable monetary relief the Court deems appropriate;

1    G.    awarding punitive or exemplary damages in accordance with proof and in an

2    amount consistent with applicable precedent;

3    H.    awarding Plaintiffs their reasonable costs and expenses of suit, including attor-

4    neys' fees;

5    I.    awarding pre- and post-judgment interest to the extent the law allows; and

6    J.    for such further relief as this Court may deem just and proper.

7                                **JURY TRIAL DEMANDED**

8    Plaintiffs hereby demand a trial by jury.

9    Dated:  April 3, 2018                    **GUTRIDE SAFIER LLP**

10

11

12

13                                _____

14                                Adam J. Gutride, Esq.
                                  Seth A. Safier, Esq.

15                                Marie McCrary, Esq.
                                  Kristen G. Simplicio, Esq.

16                                100 Pine Street, Suite 1250
                                  San Francisco, CA 94111

17                                Attorneys for Plaintiff

18

19

20

21

22

23

24

25

26

27

28

Second Amended Class Action Complaint